## Case No. 6,697.

### HOPKIRK v. PAGE.

[2 Brock. 20.][1]

Circuit Court, E. D. Virginia. May Term, 1822.

BILL OF EXCHANGE—PROTEST—NOTICE—STATE OF WAR.

1. If the drawer of a bill of exchange has no funds in the hands of the drawee, and has no right to expect it will be paid, there being no commercial transactions between the parties, notice of non-payment and protest is unnecessary. But where the drawer has a right to expect that his bill will be honoured, as where there are running accounts between the drawer and drawee, he is entitled to notice, although in point of fact he had no funds in the hands of the drawee when the bill was drawn. The sound sense and justice of the exception is, that where a drawer knows he has no right to draw, and has the strongest reason to believe that the bill will not be paid, the motives for requiring notice of the dishonour do not exist, and his case comes within the reason of the exception. Consequently, where a bill of exchange was drawn by W. B. on R. C. & Co., for £246 3s. 7d., the drawees having notified the drawer that his bills would not be honoured, although the drawees held in their hands a balance due to the drawer of 16s. 11d., notice of the non-payment and protest may be dispensed with, as such a case comes completely within the reason of the exception.

2. It is a general rule, that a long acquiescence in letters containing accounts, is prima facie evidence of the correctness of their contents.

[See Bainbridge v. Wilcocks, Case No. 755; Baker v. Biddle, Id. 764.]

3. Where a protested bill of exchange is held up for a long time without notice of its non-payment and protest, the whole onus probandi is thrown upon the holder. He must prove every thing, and nothing is required from the drawer.

4. A bill of exchange was drawn in Virginia, in November, 1775, after the commencement of hostilities between Great Britain and her colonies, payable in England, which was duly protested for non-payment in June, 1776, after all intercourse between the two countries had ceased. Held, that a state of war dispenses with the necessity of giving notice of the non-payment and protest to the drawer, but notice of its dishonour should be given within a reasonable time after the impediment is removed.

[Cited in Billgerry v. Branch, 19 Grat. 417; Farmers' Bank of Virginia v. Gunnell's Adm'r, 26 Grat. 138; McVeigh v. Bank of Old Dominion, Id. 806, 848.]

5. W. B., living in Virginia, draws a bill of exchange in November, 1775, on R. C. & Co., merchants in London, which was duly protested in June, 1776. W. B. died in 1777 or 1778. Payment was not demanded of the representative of W. B. till 1819, when suit was instituted on the protested bill. Quaere, does the doctrine of presumption of payment, arising from lapse of time, which is applicable to sealed instruments, apply to a bill of exchange? If it does, such presumption is merely prima facie, and the holder may rebut it by accounting for the time which has been permitted to elapse, and by showing the improbability that the debt has been paid. Should this presumption be rebutted, still the plaintiff shall only recover legal interest from the assertion of his claim.

[Cited in West Branch Bank v. Fulmer, 3 Pa. St. 401; House v. Adams, 48 Pa. St. 267.]

---

[1] [Reported by John W. Brockenbrough, Esq.]

6. Bills of exchange are transferable, not by force of any statute, but by the custom of merchants. Their transfer is regulated by usage, and that usage is founded in convenience. A deed, therefore, from A. to B., conveying a great number of bills, bonds, notes, &c., cannot be considered as a negotiation of the bills on mercantile principles, so as to authorize the holder to sue in his own name, though such an instrument may be considered as conveying an equitable interest, the right to receive the money.

[Cited in Re Gillespie, 15 Fed. 735.]

[Cited in Buckner v. Real-Estate Bank, 5 Ark. 539.]

7. It is a general rule in equity, that all persons having distinct interests must be brought into court; but where the interest of A. is involved in that of B., and A. possesses the legal right, so that the interest may be asserted in his name, it is not always necessary to bring both before the court.

[Cited in Piatt v. Oliver. Case No. 11,115; Bryan v. Stevens, Id. 2,066a; Franklin Sav. Bank v. Taylor, 4 C. C. A. 55, 53 Fed. 868.]

[Cited in American Bible Soc. v. Price, 115 Ill. 645, 5 N. E. 135.]

This was a suit brought in 1819, on the chancery side of this court, by James Hopkirk, a subject of the king of Great Britain, and surviving partner of Spiers, Bowman & Co. merchants of Glasgow, against the defendant, William Byrd Page, executor of William Byrd, deceased, to recover the amount of two bills of exchange, drawn by said William Byrd, late of Westover, Virginia, on Robert Cary & Co. of London. The first bill was for £353 6s. sterling, payable at sixty days sight to Edward Brisbane or order, and bearing date July 19, 1774, which bill was indorsed by the said Brisbane to Alexander Spiers, and by him indorsed to Spiers, Bowman & Co. The second bill, bearing date the 26th of November, 1775, was for £246 3s. 7d. sterling, was also payable at sixty days' sight. The bills were severally presented to Robert Cary & Co., the first on the 4th of September, 1774, and the second on the 24th of April, 1776, and at those dates respectively noted for non-acceptance, the said Robert Cary & Co. having refused to accept them, and when they respectively arrived at maturity, payment being demanded and refused, they were duly protested for non-payment. The complainant avers in his bill, that notice of the protests were duly given to the drawer in his lifetime, and required his executor, the defendant in this cause, to produce, on oath, all the books and papers of his testator to the court, before the hearing of the cause, and relied on them as furnishing evidence that notice of the protests aforesaid was regularly given. Should such evidence not be supplied, however, it is further alleged, that at the time that the bills were drawn, the drawer had no funds in the hands of the drawee, and the plaintiff insists that this circumstance dispenses with the necessity of giving notice of the protest; that shortly after the first bill was drawn, the Revolutionary war between Great Britain and her colonies commenced, and at the date of the protest of the last bill, was raging so as to intercept and prevent the prosecution of any successful remedy against William Byrd: that William Byrd died in 1777, greatly indebted, though possessed of a very large estate, and appointed his widow, Mary Byrd, his executrix, who qualified as such in the same year: that the said executrix proceeded, while the war was still raging, to administer the estate of her testator, selling all the personal estate in possession, and appropriating the proceeds to the payment of other debts, so that in 1785, according to the account of her executorship then rendered, she had administered the whole of the effects of the estate of her testator, though no part of them was applied to the payment of the said protested bills: that at the date of the protests, the plaintiff and his co-partner, were, and had always continued, to the date of the institution of this suit, non-residents of the state of Virginia, and residents of Great Britain, and that before the courts of Virginia were open to an effectual prosecution of suits for British debts, the whole ostensible assets of the said Byrd were disbursed, or claimed to be disbursed, and when the impediments which had been opposed to the prosecution of such suits were removed, the prospect of a suit against an estate, ostensibly insolvent, was too discouraging to permit the institution of this suit. But it was alleged that assets to a large amount had recently come to the hands of the executor of Byrd, out of which the plaintiff prayed satisfaction of the aforesaid protested bills of exchange. William Byrd Page admits, in his answer, that the signature to the said bills is in the handwriting of his testator, but does not admit that Byrd had notice of their dishonour. He denies, that at the time the bills were drawn, the drawer had no funds in the hands of the drawees. William Byrd was for some years in the habit of shipping large quantities of tobacco to Robert Cary & Co., his merchants in London. They also sold for him his estate in England for £15,000 or £20,000 sterling. He therefore requires the plaintiff to produce evidence of the notice of the dishonour of the bills, or of such facts as will dispense with the necessity of proving notice. He further pleads the statute of limitations of Virginia in bar of a recovery, while he does not admit that all the members of the firm of Spiers, Bowman & Co. have always resided out of the state of Virginia: he insists that the fact of their having branches of their mercantile house at Petersburg and other places in Virginia, and agents and factors in this state, will preclude the plaintiff from availing himself of the exception in the act of limitations in favour of persons beyond seas. But if the act of limitations does not create an absolute bar to a recovery, he still relies on the great lapse of time as furnishing a strong presumption of their payment.

MARSHALL, Circuit Justice. This suit is brought to obtain payment of two bills of exchange drawn by the late William Byrd, of Virginia, on Robert Cary & Co., merchants of London, the one in the year 1774, and the other in 1775. These bills were regularly protested; but the defendant makes several objections to paying them. The first to be considered is, that no notice of their non-payment and protest was given either to William Byrd in his lifetime, or to his representatives, since his death. The plaintiff contends that this notice was unnecessary, because the drawer had no funds in the hands of the drawee. Although this application, in consequence of the state of the fund to which the plaintiff must resort, it consisting of equitable assets, is made to a court of equity, it is admitted to be a law case depending entirely on legal principles. It requires an attentive consideration of the question, how far the want of funds of the drawer in the hands of the drawee discharges the holder of a bill of exchange from the necessity of giving notice to the drawer of its dishonour. The rule requiring this notice was for a long time supposed to be general, and Mr. Justice Blackstone in his Commentaries (2 Bl. Comm. 469) lays it down without any exception. The first case in which an exception was admitted, is Bickerdike v. Bollman, decided in November, 1786, and reported in 1 Durn. & E. [1 Term R.] 405; in that case the court stated, that if it be proved by the holder that "from the time the bill was drawn till the time it became due, the drawee never had any effects of the drawer in his hands," notice to the drawer is not necessary. The reason given is, that he had no right to draw, and could not be injured by not receiving notice. An additional observation made by one of the judges is, that to draw in such a case "is a fraud in itself." It does not appear from the report of this case, nor is there any reason to believe, that there were any running accounts between the parties; the whole complexion of the case, and the reasons assigned by the judges for their opinions, negative the idea; it is simply the case of a debtor drawing a bill on his creditor, without a prospect of its being paid. In such a case, notice is declared by the court to be unnecessary. It is remarkable that in this case, although the principle is expressly asserted by both the judges, each declares that the case would be decided in the same way on a different principle. In Goodall v. Dolley (decided in 1787) 1 Durn. & E. [1 Term R.] 712, the judgment was against the holder of the bill, for want of notice; but in giving his opinion, Mr. Justice Buller recognises the principle established in Bickerdike v. Bollman. In Rogers v. Stephens (decided in 1788) 2 Term R. 713, the law is said to be settled, that no effects of the drawer in the hands of the drawee, excuses the holder from the necessity of giving notice,

yet, it is remarkable that in this case, all three of the judges rely very much on a subsequent assumpsit made by the drawer. In Gale v. Walsh (decided in 1793) 5 Term R. 239, the principle appears to be recognised; but a rule to show cause why a new trial should not be granted for this cause, was discharged, because the fact did not exist in the case.

These are the earliest cases on this point; it has occurred very frequently in subsequent cases, and the principle seems to be firmly established; but as the question has come forward in different forms, and been viewed under different aspects, the principle has been greatly modified, and is no longer laid down in the general terms which were carelessly used on its introduction. It has been found necessary to define its extent with more precision, and to state the rule with more accuracy. It was perceived, that in the course of commercial dealing, it would frequently occur that a person might draw a bill with the best reasons for believing that it would be honoured, although, in fact, he might have, at the time, no funds in the hands of the drawee; and that all the reasons for requiring notice, would apply in such a case, with the same force as if the bill had been drawn on actual funds. In Legge v. Thorpe, 12 East, 171, Le Blanc and Bayley, Justices, stated the principle laid down in Bickerdike v. Bollman, and afterwards adhered to, in these terms: They said, "that the court in that case, looking to the reason for which notice was required to be given, laid down the rule, not generally, that where the drawer had no effects in the hands of the drawee at the time (which perhaps might turn out to be the case upon a future settlement of accounts between them), no notice of dishonour should be given; but that it need not be given where the drawer must have known at the time that he had no effects to answer the bill, and could have no reason to expect that his bill would be honoured." In Blackhan v. Doren, 2 Camp. 503, Lord Ellenborough said: "If a man draw upon a house with whom he has no account, he knows that the bill will not be accepted, he can suffer no injury from want of notice of its dishonour, and, therefore, he is not entitled to such notice. But the case is quite otherwise where the drawer has a fluctuating balance in the hands of the drawee." In Walwyn v. St. Quintin, 1 Bos. & P. 654, one of the strongest cases in the books in favour of dispensing with notice, Eyre, C. J., said: "But it may be proper to caution bill-holders not to rely on it as a general rule, that if the drawer has no effects in the acceptor's hands, notice is not necessary. The cases of acceptances on the faith of consignments from the drawer, not come to hands, and the case of acceptances on the ground of fair mercantile agreements, may be stated as exceptions, and there may pos-

sibly be many others." In Brown v. Maffey, 15 East, 216, Lord Ellenborough said: "The doctrines of dispensing with notice of the dishonour of a bill has grown almost entirely out of the case of Bickerdike v. Bollman. That decision dispensed with the notice to the drawer, where he knew beforehand that he had no effects in the hands of the drawee, and had no reason to expect that the bill would be paid when it became due." "But that exception must be taken with some restrictions, which, since I sat here, I have often had occasion to put on it, as where the drawer, though he might not have effects at the time of the drawing of the bill in the drawee's hands, has a running account with him, and there is a fluctuating balance between them, and the drawer has reasonable ground to expect that he shall have effects in the drawee's hands when the bill becomes due. In such cases, I have always held the drawer to be entitled to notice, because he draws the bill upon a reasonable presumption that it will be honoured." In Rucker v. Hiller, 16 East, 43, Lord Ellenborough said: "Where the drawer draws his bill in a bona fide expectation of assets in the hands of the drawee to answer it, it would be carrying the case of Bickerdike v. Bollman farther than has ever been done, if he were not at all events entitled to notice of the dishonour. And I know the opinion of my lord chancellor to be, that the doctrine of that case ought not to be pushed farther." "The case is very different where the party knows that he has no right to draw the bill. There are many occasions where a drawee may be justified in refusing from motives of prudence to accept a bill, on which notice ought nevertheless to be given to the drawer; and if we were to extend the exception farther, it would come at last to a general dispensation with notice of the dishonour, in all cases where the drawee had not assets in hand at the very time of presenting the bill; and thus get rid of the general rule requiring notice, than which nothing is more convenient in the commercial world. A bona fide reasonable expectation of assets in the hands of the drawer, has been several times held to be sufficient to entitle the drawer to notice of the dishonour, though such expectation may ultimately fail to be realized." And in the same case, Bayley, J., said: "The general rule requires notice of the dishonour to be given in due time to the drawer, and it lay upon the plaintiff to show that he could not possibly be injured by the want of it. It would be somewhat hard to call upon the drawer towards the end of six years after the bill given; and when he objected that he had no notice of the dishonour, to tell him that he had no effects in the drawee's hands at the time when the bill was presented; though they might have come to his hands the very day after, and the drawee might have settled his accounts with the drawer on the presumption that the bill was paid."

The subject was considered by the supreme court of the United States, in the case of French v. Bank of Columbia, 4 Cranch [8 U. S.] 141, 2 Pet. Cond. R. 58. In that case, it was said (by Marshall, C. J., who delivered the opinion of the court) "to be the fair construction of the English cases, that a person having a right to draw in consequence of engagements between himself and the drawee, or in consequence of consignments made to the drawee, or from any other cause, ought to be considered as drawing upon funds in the hands of the drawee, and, therefore, as not coming within the exception to the general rule." When the drawer is continually making consignments to the drawee, and continually drawing on those consignments, his conduct may be essentially affected by knowing that any of his bills have been protested. He may stop in transitu, or may suspend further consignments. It may be as material to his interest to place no more funds in the hands of the drawee, in such a case, as to withdraw the funds previously placed in his hands. Notice may be as important to him in the one case as in the other, and there seems to be the same reason for requiring it—supposing the rule to be, that every person having a right to draw, or having reason to believe that his bill will be honoured is entitled to notice.[2] I will proceed to apply the principle to the facts of this case; and in doing it, I shall consider the two bills separately.

[2] The doctrine, with its modifications, as laid down in the above opinion of Chief Justice Marshall, and in the case of French v. Bank of Columbia [supra], has been examined and re-affirmed in a recent case decided by the supreme court of the United States. In the case of Dickins v. Beal, 10 Pet. [35 U. S.] 572 (January term, 1836), in delivering the opinion of the court, and after a rapid review of the cases reported in the English books cited above, Mr. Justice Baldwin continues: "But unless he draws under some such circumstances, his drawing without funds, property, or authority, puts the transaction out of the pale of commercial usage and law; and as he can in nowise suffer by the want of notice of the dishonour of his drafts, that it is deemed an useless form. 'Notice, therefore, can amount to nothing, for his situation cannot be changed.' In a case where he has no fair pretence for drawing, there is no person on whom he can have a legal or equitable demand, in consequence of the non-payment or non-acceptance of the bill. This is the rule, as laid down by the court in French v. Bank of Columbia, 4 Cranch [8 U. S.] 153, 164, on a very able and elaborate view of the then adjudged cases; which is fully supported by those since decided in England, and in the supreme court of New York. The case of the defendant falls clearly within the rule applicable to bills drawn without funds, or any bona fide, reasonable, or just expectation of their being honoured; and notice of their dishonour was not necessary." In truth, no principle of commercial law can be more firmly established, and it would seem that the only question which can hereafter arise with respect to it, will be, not as to the extent of the general doctrine, but in its application to the facts of the particular cases.

On the 19th of July, 1774, William Byrd drew on Robert Cary & Co., in favour of Edward Brisbane, for the sum of £353 6s. This bill was indorsed by Edward Brisbane to Alexander Spiers, and by him to the company. On the 17th of November, 1774, it was protested for non-payment. The first information that appears to have been given of this protest to Colonel Byrd, or his representatives, was the institution of this suit in 1819. The executor of Byrd resists its payment for want of notice, and the plaintiff alleges that notice was unnecessary, because the drawer had no effects at the time in the hands of the drawee. To support this allegation, he relies on several letters written by Robert Cary & Co. to William Byrd, which have been exhibited by the executor on his requisition. The defendant objects to this testimony, that the letters are the mere allegations of Robert Cary & Co., and do not contain a full statement of the correspondence between the parties, or of their accounts: that Colonel Byrd may not have acquiesced in the accounts transmitted with these letters, or in the statements they contain, although, from the loss of papers, the death of parties, and the great lapse of time, the papers cannot now be produced.

The general rule is, that a long acquiescence in letters containing accounts, is prima facie evidence of an acquiescence in their contents; and there is less reason for excepting this case from the rule, because the letters of Robert Cary & Co., from November, 1773, to October, 1775, do not notice any objection, on the part of William Byrd, to any of the accounts which, one of those letters says, were annually transmitted to him. The letter from Robert Cary & Co. to William Byrd, dated the 10th of November, 1773, incloses an account current, showing a balance due Robert Cary & Co. of £616 9s. 1d. This letter gives notice of the completion of a contract for the sale of Byrd's English estate; says the money is to be paid the 5th of April; that they shall immediately afterwards take up the whole of his bills; and says that they have referred Farrell & Jones to him, to determine whether they shall pay a debt of about £800, claimed by Farrell & Jones. The next letter is dated the 13th of May, 1774. It states the receipt of £5000 on account of the estate which had been sold, and the expectation of receiving the farther sum of £11,500 on the same account. It states the payment of debts to the amount of £5544 7s. 4d. and gives a list of other debts due from Byrd, to the amount of £11,577. The letter concludes with saying, that by Greenland's estimate, the produce of the estate will not exceed £15,500, out of which great charges are to be deducted. From this sketch the letter proceeds: "You will be able to judge how the account may stand, and what bills must be returned." It is observable, that among the debts paid, are several bills of exchange, which had been long protested,

one of them as early as February, 1768. This fact shows an understanding by which bills were held up after a protest, in the expectation that they would be paid by the drawee, notwithstanding the protest. In such a case, if no notice be given, the law seems to be, that the holder looks to the drawee, not to the drawer, for payment. Townsley v. Sumrall, 2 Pet. [27 U. S.] 170. The next letter, of the 5th of August, 1774, states that there are many bills which must be returned, after paying all the money received on account of the English estate. This letter speaks of a further sum for a half year's rent, accruing before the purchaser took possession, to be received after Michaelmas. This would be £371 4s. 6d. There is, too, a subsequent letter, of the 14th of March, 1775, which mentions a farther receipt of £448 12s. 1d., on account of the English estate. Colonel Byrd appears to have drawn to the full amount of his English estate, so far as Robert Cary & Co. had stated the money to have been received; and if the transactions between the parties had gone no farther, these letters would furnish strong reasons for the opinion that, in July, 1774, he acted at least incautiously in drawing the bill under consideration. But there were transactions between the parties. Colonel Byrd held a large estate in Virginia, and the usage of the considerable planters to ship their tobacco to London merchants, and to draw on their consignments, is of general notoriety. In their letter of the 17th of November, 1774, Robert Cary & Co. say: "We shall, in the disposal of your tobacco, hope to render you a safe and pleasing tale." In a letter of the 10th of February, 1775, is an account of sales of fifteen hogsheads of tobacco, shipped in a vessel commanded by Captain Powers; and there is also notice taken of a mortgage on the estate sold to Mrs. Otway, for which no claimant had appeared, but for which Mrs. Otway had retained a considerable sum in her hands. The letter says: "We were compelled to settle the conveyance in the manner we did, yet at the same time, it no ways precluded you from receiving your part of this other mortgage, if no claimants." The letter shows that Colonel Byrd had written on this subject, and had manifested the expectation of receiving a further sum on this account. The letter mentions the payment of some small orders given by Byrd. It may be considered as probable, from these letters, that Colonel Byrd was not perfectly satisfied with the sums retained on account of charges on the estate, and expected more money from it. A letter of the 20th of June, 1775, states the payment of a draft drawn by Colonel Byrd, in favour of Hornsby, for £75, and their payment for his honour of another draft on Farrell & Jones for the same sum. The last letter is dated 2d of October, 1775. It mentions the payment of several little drafts, as desired by Colonel Byrd, "which are mentioned in an account current inclosed," but the ac-

count itself does not appear. It shows a balance, as the letter says, of 16s. 11d. in favour of Colonel Byrd.

From this review of the letters in the cause, it is obvious that Colonel Byrd was much pressed for money; that he was sanguine in his calculations of the sums to be yielded by his estate in England; that he drew upon that fund by anticipation, and to an amount greater perhaps than was strictly justifiable. It is also apparent that a considerable part of the money for which the estate sold, was retained for incumbrances, some of which were questionable, and there is reason to believe that he questioned them. It is also apparent that there were running transactions between the parties, and that the holders of his bills were in the habit of retaining them, and of receiving payment long after protest. That he made shipments of tobacco in the time, is unquestionable; but the amount of his shipments is uncertain; his letters are not produced; they would throw much light on this transaction. The letters giving notice of this particular draft, might, and probably would, show the idea on which it was drawn, and the calculations of the drawee; it might be drawn on actual consignment of tobacco, or it might be drawn on a calculation that something farther might be yielded by those items of the English estate, which the letters show had not finally been adjusted. These calculations may have been erroneous; but if they were made, the bill was not drawn with a knowledge that it would not be honoured, and therefore notice of its dishonour was unnecessary. The court will not presume that these calculations were made; the court will not presume that the letter of advice which usually accompanies a bill of exchange, did show that the drawer calculated on his bills being honoured; but the court cannot presume the contrary; and it is to be recollected that when a protested bill is held up for a great length of time without notice, the whole onus probandi is thrown on the holder; he must prove every thing, and nothing is required from the drawer. The case furnishes strong reason for the opinion, that this bill was not returned to Virginia, but was held up by Spiers, Bowman & Co. in the expectation of its being paid by Robert Cary & Co. It was drawn on the 19th of July, 1774, and protested for non-payment on the 26th day of November of the same year. Another bill for £213 15s., drawn on the 4th of July, 1774, in favour of Spiers, Bowman & Co., and protested on the 9th of November, 1774, was returned to Colonel Byrd, and was taken up; these bills drawn by the same persons, and held by the same house, at the same time, would probably have been returned by the same vessel had they been both returned. The circumstance that one was drawn in favour of Brisbane, an agent of the company, and indorsed by him to a member of the company, and by that member to the company, would not account for the appearance of one bill without the other, if both were returned. They were both the property of the same company, both due by the same person, both in possession of the company at the same time, and would probably have been both returned, if they were both returned, by the same vessel. The bill, said not originally to have been drawn in favour of Spiers, Bowman & Co., would probably have been transmitted to the same agent to whom the other bill was transmitted. The appearance of the one bill without the other, is, then, a strong circumstance in favour of the opinion that the bill retained was held up in England in the expectation of its being paid by the drawee. In estimating the probabilities of the circumstances and prospects under which the bill was drawn, this fact is entitled to some consideration. We have no regular accounts, no statements of the consignments made by Byrd to Robert Cary & Co. We know that their connexion was of long standing; that there was a considerable degree of mutual kindness and confidence; that Byrd was in the habit of shipping tobacco to Robert Cary & Co.; that there may have been a shipment at the very time this bill was drawn; that money was paid for Byrd by Robert Cary & Co., after this bill was protested; that a bill of £75 was taken up for his honour; and that in October, 1775, the balance of £616 9s. 5d., which stood against him in November, 1773, was converted into a balance of 16s. 11d. in his favour. We have not all the intermediate accounts, and we do not know how this balance may have fluctuated; add to this, that the bill is not said to have been protested for want of effects.

Under all these circumstances, I cannot say that the bill was drawn with a knowledge that it would be protested; and that notice of the protest could not be necessary. I cannot say that it was a fraud upon the payee, by giving him a bill which the drawer knew would not be paid. If the onus probandi lay on the drawer of the bill, the case would be clearly against him; but as it lies entirely on the holder, whose laches are without a precedent in a court of law or equity, I think he has not made out a case of complete justification, on which he can entitle himself to a decree for the bill drawn on the 19th of July, 1774. The second bill was drawn on the 26th day of November, 1775, for £246 3s. 7d., and was protested on the 26th day of June, 1776. It was drawn after the commencement of hostilities in Virginia; and before it was protested, all intercourse between the two countries was interdicted. Under these circumstances, notice is not to be expected, and ought not to be required. I at first doubted whether a bill, which, for a length of time, is held under circumstances which dispense with notice, does not lose its commercial character, and become an ordinary debt. But on reflection, I am satisfied that

this idea cannot be sustained: and that to charge the drawer, notice of the dishonour of his bill ought to be given within a reasonable time after the removal of the impediment. The question, therefore, on this bill, also is, were the circumstances under which it was drawn such as to dispense with notice? Was it drawn without reasonable ground for an expectation that it would be paid? It may reasonably be supposed, that on the 26th of November, 1775, the letter of the 2d of October, 1775, which came by the last packet to New York, was received. In attempting to show that notice of the dishonour of this bill was unnecessary, because the drawer had no effects in the hands of the drawee, the holder is met in limine, by the fact that this letter shows a balance in his favour of 16s. 11d., and the exception under which the plaintiff withdraws himself from the general rule, is, that the drawer had at the time no effects in the hands of the drawee. If we may depart from the letter of the exception, there is no point at which to stop; and if notice may be dispensed with when a small sum is in the hands of the drawer, it may also be dispensed with when a large sum is in his hands, provided that sum be one cent less than the bill is drawn for. I am aware of this argument, but think it more perplexing than convincing. There are many questions in which no precise line can be marked, which must depend on sound legal discretion, and where the case itself must be decided by a jury or by the court, acting on the principles which ought to regulate a jury. The sound sense and justice of the exception is, that where a drawer knows he has no right to draw, and has the strongest reason to believe his bill will not be paid, the motives for requiring notice of its dishonour do not exist, and his case comes within the reason of the exception. Where all transactions between parties have ceased, and there is nothing to justify a draft but a balance of one penny, it would be sporting with our understanding to tell us, that a creditor for this balance, who should draw for a thousand pounds, would be in a situation substantially different from what he would be in, were he the debtor in the same sum. The true inquiry appears to me to be whether the connexion between William Byrd and Robert Cary & Co. remained such as to justify a hope that his bill would be honoured, and to afford any shadow of justification for drawing it. I think it as demonstrable as any proposition of this sort can be, that he knew that this bill would not be paid. He had no funds in the hands of the drawee except 16s. 11d., and no prospect of having any. He had made no shipment of tobacco by the last vessel, and Robert Cary & Co. speak of the fact with some resentment. In their letter of June, 1775, they had mentioned

sending a vessel to Virginia chartered at a high price, in which they expected consignments of tobacco from their friends, and among others, from Colonel Byrd. In their letter of the 2d of October they say: "When Power came in, we were in hopes you would have offered him some assistance, but we observe the high price in the country was the cause of the disappointment, and no compliment to our charter. However, if we are no losers, we are not beholden to our friends for it."

With respect to the mortgage for which it had been supposed that the mortgagee was dead without a representative, he says, "it is feared the representative is found, but be this as it may," he adds, "the estate will be always liable, and therefore, without a proper indemnity, little can be expected. What indemnity you may offer we know not, but we shall not engage for our own parts." After mentioning the payment of some bills, they add, "but for paying any more, or raising money on the uncertainty of the mortgage, we shall not attempt." With this letter before him, Colonel Byrd must have drawn, I think, with a moral certainty that his bill would be dishonoured: and if in any case a holder can be excused for not giving notice, this is that case. There was an end of all consignments, of all intercourse between the parties; there were no funds to withdraw, and no remittances to stop. The want of notice would be no injury to him. This case seems to me to come within the exception of Bikerdike v. Bollman, as modified in the subsequent cases.

This brings me to the consideration of the other objections made by the defendant to the payment of this bill. He contends, that after such a lapse of time, payment must be presumed.[8] Admitting the doctrine of

[8] The statute of limitation did not apply to this case. See Hopkirk v. Bell, 3 Cranch [7 U. S.] 454; 4 Cranch [8 U. S.] 164. By the fourth article of the definitive treaty of peace, between the United States and his Britannic majesty, of 1783, "it is agreed that creditors on either side shall meet with no lawful impediment to the recovery in full value in sterling money of all bona fide debts heretofore contracted," which fourth article is recognised, confirmed, and declared to be binding and obligatory by the second article of the convention between his Britannic majesty and the United States, made on the 8th of January, 1802. By the fourth section of the act of limitation of Virginia, all actions of debt, detinue, &c., are directed to be brought within five years after the cause of action shall have accrued. By the 12th section of the same act, there is a saving of persons beyond seas, but by the 13th section, it is provided "that all suits hereafter brought in the name or names of any person or persons, residing beyond seas, or out of this country, for the recovery of any debts due for goods actually sold and delivered here, by his or their factor or factors, shall be commenced and prosecuted within the time appointed and limited by this act, for bringing the like suits, &c., notwithstanding the saving &c., to persons beyond the seas, at the time their causes of action accrued." The case of Hopkirk v. Bell, was certified from the circuit court of Virginia, in which the opin-

presumption to be the same in respect of a bill as of an instrument under seal, of which I am not so confident,[4] still it is not a posi-

ions of the judges, (Marshall, C. J., and Griffin, J.) were opposed upon the following question, to-wit: "Whether the act of assembly of Virginia, for the limitation of actions pleaded by the defendant, was, under all the circumstances stated, a bar to the plaintiff's demand founded on a promissory note, given on the 21st of August, 1773?" The certificate contained the following statement of facts agreed by the parties, viz: That David Bell, the defendant's testator, has considerable dealings with the mercantile house of "Spiers, Bowman & Co." of Glasgow, (of which house the plaintiff was surviving partner) in the then colony of Virginia, by their factors who resided in that colony, and on the 14th of March, 1768, gave his bond to the company, &c., and on the 21st of August, 1773, Henry Bell, the defendant, executed his promissory note to Spiers, Bowman & Co. for £437 14s. 10d. and on this note this suit was instituted, on the 4th of January, 1803. That the said Spiers, Bowman & Co., were at that time British subjects, merchants resident in Glasgow, and had never resided in Virginia, and that James Hopkirk was then, and always had been, a British subject, resident in Great Britain, and never had been in Virginia. That the company had a factor or factors resident in Virginia on the 21st of August, 1773, when the note was given, and from that time to the commencement of the American war, on or about the 1st of September, 1776. That the company had neither agent nor factor in this country authorized to collect their debts from the commencement of the war until 1784. That on or about the 10th of September, 1784, and ever since, an agent had resided in Virginia, authorized by power of attorney generally to collect all debts due to the company in Virginia. The supreme court ordered the following opinion to be certified to the circuit court: "That upon the question in this case, referred to this court from the circuit court, it is considered by this court that the said act of limitations is not a bar to the plaintiff's demand upon the said note: and this court is of opinion that the length of time from the giving the note to the commencement of the war in 1775, not being sufficient to bar the demand on the said note, according to the said act of assembly, the treaty of peace between Great Britain and the United States of 1783, does not admit of adding the time previous to the war to any time subsequent to the treaty in order to make a bar: and is also of opinion that the agent merely for collecting debts mentioned and described in the said state of facts, is not to be considered as a factor within the meaning of the said act of assembly so as to bring the case within the proviso of the said act." The same case went again to the supreme court (see 4 Cranch [8 U. S.] 164), when, in addition to the facts before stated, it appeared that Andrew Johnston, of the firm of Spiers, Bowman & Co., came to the United States, after the peace of 1783, viz: in the spring of 1784, and died in Virginia in 1785, but that no other partner of the firm had been here since the peace. The court ordered it to be certified as their opinion, that under all the circumstances stated, the act of limitations of Virginia was not a bar to the plaintiff's demand on the note of the 21st of August, 1773. As to the doctrine of presumption of payment in actions upon old bonds, see note to Murdock v. Hunter [Case No. 9,941].

[4] In an action of debt on a promissory note, the court, if requested, ought to instruct the jury, that, twenty years having elapsed between the date of the execution of the note and the institution of the suit, they ought to presume it paid, unless evidence be offered of some acknowledgment of the debt, or of payment of interest, or of part payment of the principal

tive rule, depending absolutely, like the statute of limitations, on length of time, but is the mere creature of reason, resting on probabilities. The creditor may meet this presumption and rebut it by accounting for the time which has been permitted to elapse, and by showing the improbability that his debt has been paid. He has, I think, met and completely rebutted it in this case. The bill was protested in England on the 26th day of June, 1776, and Colonel Byrd died in 1777 or 1778. In the meantime, war raged between the two countries; all intercourse between them was unlawful; and Colonel Byrd's circumstances were too much embarrassed to admit of a suspicion that he would be eager in his search for those creditors who could make no legal demand upon him. It is, then, almost certain that this debt was not paid by him in his lifetime.

The chief argument in support of this presumption, is founded on the time which has elapsed since his death, without any demand on his representatives. The plaintiff ascribes this to the insolvency of his estate; but to this it is answered that a suit had been brought in 1803, for a different claim, by the same agent, who was in possession of these bills; a bill was then filed claiming £70 19s. 10d., as a debt due from William Byrd & Co. for dealings at their store in Manchester, and £10 19s. 6½d. a debt due from William Byrd for dealings at their store in Petersburg. If the insolvency of the estate did not prevent this suit, it cannot have prevented a suit on the bills. The plaintiff assigns two reasons for this suit, by which he attempts to repel the inference which has been drawn from it. One is, that though William Byrd was supposed to be insolvent, William Byrd & Co. were not so. The other, that this suit was only preparatory to an application to the British commissioners, sitting under the treaty of 1802; neither of these reasons is satisfactory; the suit does not seek for satisfaction from the

within twenty years Wells v. Washington's Adm'r, 6 Munf. 532. But if more than five years and less than twenty years have elapsed, the defendant cannot rely on the presumption of payment, but he must plead the statute. Tomlin's Adm'r v. How's Adm'r, 1 Gilmer, 1. In the case of Du Belloix v. Lord Waterpark (decided in 1822) 1 Dowl. & R. 16, 16 E. C. L. 12, which was an action of assumpsit by the payee against the maker of a promissory note, it was contended that the jury were bound to presume, from analogy to the case of the bond, that after twenty years, the note had been paid, although there was no proof that the payee had been within the realm; but the chief justice (Abbott) held, that the case of a bond was distinguishable from promissory notes and bills of exchange, which were simple contract debts, and were subjected to the provisions of the statute of limitations; whereas, the rule for presuming payment of a bond after twenty years, was founded on the common law, there being no statutable provision with respect to obligations of that nature; and, therefore, without some decisive authority on the point, he could not direct the jury in the way contended for.

effects of William Byrd & Co.; nor does it even charge that William Byrd was the surviving partner of that company, or even had any of its property in his hands; it charges him merely as a member of the company, and seeks for satisfaction out of his private estate, which is alleged to be in the hands of his executor, or of his trustees. But this reason, were it more consistent with the fact, would not apply to the claim against him as an individual. To account for this, we are told that it was necessary to establish the debt, in order to justify an application to the British commissioners. But surely it was not less necessary to establish the claim on this bill than on an open account. The production in 1804, or afterwards, of a protested bill without notice to the drawer of its dishonour, or proof of a single attempt to obtain payment of it, could never be received by the commissioners as a valid claim on the British government. But if these bills were held up in order to be laid before the commissioners, why were they not laid before that board? Is not the fact that no application has been made on them to the commissioners, a proof that this is not the cause which prevented the institution of suits on them in this country?

If it be said that they have been laid before the commissioners, I ask what has been the fate of the application? Has it been rejected in consequence of the laches of the holder, or has it been successful? But there is no reason to believe that the suit in 1803 was brought with any other view than to recover the money it demanded, and the question recurs—why were not these bills put in suit also? It has been said they were overlooked by the agent—but this is not credible. There is an indorsement on the envelope which contained them, in his hand writing, and it must be supposed that bonds, bills, and notes were not thrown in confusion among general books and papers, but were carefully preserved and listed, and that they would be immediately inspected by the agent to whom their collection was confided. Must it then be presumed that the agent believed them to be paid? The reasons against this presumption, so far as respects a payment made by Colonel Byrd, have already been stated. The reasons against their having been paid by his representatives are still stronger. Their accounts are all preserved, and this credit is not claimed. How could the agent have received an impression that they were paid? He must have received it from the papers themselves, from the entries on the books, or from direct communications made by Spiers, Bowman & Co. But the papers contain no indications of payment. The books, I am told, contain none; and is it reasonable to suppose that the plaintiff would send the bills to be collected, and write to the agent that nothing was due on them? We must impute negligence to the agent, or believe that

he was of opinion that the debt was not recoverable at law. The last opinion, however, does not necessarily imply his conviction that it had been paid. The bills were not accompanied with any proof of notice, and he could obtain none. Without this proof, and without any evidence that the drawer had no right to draw, he might have thought the claim desperate; but this does not create a presumption that he believed it to be paid. I think, on a consideration of the circumstances of the case, that the presumption of payment is completely rebutted.

I am next to consider an objection which goes to the right of the plaintiff to sustain this action, even admitting that the right to bring it exists in some person. In 1813 a contract was entered into between the plaintiff and William C. Williams, a citizen of Virginia, by which the former conveyed to the latter all his debts in this country, and authorized him to sue for them, either in his own name, or in the name of the present plaintiff. It is contended that these bills passed by this assignment, and that the whole legal and equitable interest being in another, no suit on them can be maintained by the plaintiff. On the part of the plaintiff it is answered, that this instrument, being made flagrante bello, is void, and that no action can be sustained on it, even after peace. As this may probably become a question between the parties to the instrument, I would not give an opinion on it unless it should be necessary in this cause. I am rather disposed to think it is not necessary. Bills of exchange are transferable, not by force of any statutes, but by the custom of merchants. Their transfer is regulated by usage, and that usage is founded in convenience. It appears to me that it would be extremely inconvenient to separate the evidence of ownership from the bill itself, and I think there is no usage to justify such a separation. Nothing can be more anti-commercial than the idea of transferring a negotiable paper by a deed transferring a vast number of bills, bonds, notes, and accounts. Such an instrument may very properly be considered as conveying the equitable interest, the right to receive the money, but cannot be considered as a negotiation of the bill upon mercantile principles, or according to mercantile usage, so as to authorize the holder to sue in his own name. The books treat of no such mode of transfer. The person to whom a bill is transferred is never denominated an assignee. He is always termed an indorsee. Upon this ground, I am of opinion, that in this case a suit could not be maintained in the name of William C. Williams. Were this even doubtful, the instrument now relied on contains an authority to sue in the name of the plaintiff, and may, therefore, fairly be considered as not being intended to have the legal effect of an assignment, but to operate as an agreement authorizing William C. Williams to

exercise all the powers of ownership in the name of the plaintiff. But I rely on the principle, that a bill of exchange is not, by the custom of merchants, transferable by such an instrument as is produced in this case. But the defendant contends, that, admitting the suit to be maintainable in the name of the plaintiff, still William C. Williams ought to be a party, because in a court of equity, all persons concerned in interest must be parties. I do not think the rule applies to such a case as this. All persons having distinct interests, must undoubtedly be brought into court; but where the interest of one person is involved in that of another, and that other possesses the legal right, so that the interest may be asserted in his name, it is not, I think, always necessary to bring both before the court. Thus, a trustee may sue, without naming the cestui que trust as a party,—an executor or administrator may sue, without naming legatees or distributees. And the obligee in a bond, where it is not by law assignable, may sue, or the equitable assignee may sue in his name, without being named himself as a party. This may, I think, be done in a court of equity as well as a court of law. The person having the equitable interest, if the suit be not really brought for his benefit, may insist on being made a party, and the court will direct it: but I do not think the omission of persons in this situation any objection to the suit. Had this suit been brought by William C. Williams, Hopkirk must have been made a party; but I do not think Williams a necessary party to a suit brought by and in the name of Hopkirk. I am of opinion that the plaintiff is entitled to a decree for £246 3s. 7d. sterling, with interest thereon, at the rate of ten per cent. per annum, for eighteen months, and with interest on the whole sum at the rate of five per cent. per annum, either from the expiration of eighteen months, or from the time that this claim was asserted in court, according to the manner in which the act in the Revisal (1745), which regulates this transaction, has been construed. I shall give the five per cent. only, from the assertion of the demand in court, unless by a reference to the records of the general or district court, it can be shown that the law has been expounded, to allow interest from the expiration of the eighteen months.