Sneed, J".,
delivered the opinion of the court:
The action is upon a bill of exchange for $10,958.50, drawn by the defendant, Rawlings, at Memphis, Tenn., on M. I). Cooper & Co., commission merchants in Mew Orleans, and accepted by them. The bill was drawn on the 11th of November, 1861, at six months, and is payable to the order of the drawer, and was by him indorsed to the plaintiff. The verdict and judgment below were for the defendant, and appeal in error by the plaintiff.
The bill sued on was the last of a series of like transactions between the defendant and M. D. Cooper & Co., who were his merchants and factors at Mew Orleans, all other bills having been paid or renewed at maturity. When the first "bill was drawn, early in 1861, the defendant had in the hands of his said factors 654 bales of cotton —the first bill being for $10,000. The said M. D. Cooper & Co. were instructed by the defendant to sell the cotton and meet the bills. They did sell about 435 bales. When the bill sued on was drawn, the said acceptors had in their hands some 235 bales of the defendant’s cotton, which they were instructed to sell and meet the bill. These instructions were never withdrawn, but there was no' sale, for the reason, as alleged by said acceptors, that there was no market. In the summer of 1862, about the middle of the month of July, as the defendant remembers, he was informed at Memphis, by Frierson, a member of the firm of M. D. Cooper & Co., that the 235 bales of cotton so shipped to the acceptors at Mew Orleans, had been burned by the Confederates on the approach of the Federal forces to Mew Orleans. The exact date of the destruction of the cotton does not appear, but it does not appear that the Federal forces captured the city of Mew Orleans between the 24th of April and the 1st of May, 1862. In the same conversation, the said Frierson told the defendant not to be uneasy about the cotton, as the house of M. D. Cooper & Co. would hold the warehouseman, who held in storage at the time of its destruction, hable for its value. These *299 facts are shown in tbe testimony of tbe defendant himself, and it appeal's in tbe testimony of F. H. Smith, tbe plaintiffs witness, that tbe defendant made to bim substantially tbe same statements in tbeir negotiations about tbe payment of the bill, in reference., especially, to tbe time when Frierson advised bim of tbe destruction of tbe cotton. There are facts and testimony in tbe case, however, tending to show that Frierson, having been in Memphis as early as the 6th of June, 1862, may have imparted said information at an earlier day, but tbe only affirmative testimony that assum.es to identify, approximately, tbe date is that of tbe .defendant bimself. As will be seen, tbe bill matured on the 14th of May, 1862. Neiw Orleans, tbe residence of tbe acceptors, being then in the possession of the United States forces, and Memphis, the residence of tbe defendant, remaining in the possession of the Confederates until June 5th, 1862, when it was captured by tbe Feder-áis. In May, 1862, the assets of tbe plaintiff, including tbe first of exchange of tbe bill in suit, were, by orders of the Confederate, authorities, carried south. But tbe cashier of tbe bank, with the second of the bill, and a descriptive list of this and other like cboses in actions belonging to tbe bank, remained in Memphis, and was certainly there between tbe 6th of June, 1862, and tbe 31st of March, 1863, when commercial intercourse by mail and by express via Cairo and New York, was open, safe and lawful between Memphis and New Orleans. There was no presentment or demand for payment made until May, 1865, when the said cashier took the second of exchange, with others, to New Orleans, where demand and the bill protested for nonpayment, and notice thereof, sent to defendant. In July of the same year, the assets of the bank having been brought back to Tennessee, tbe first of exchange was, in like manner, sent to New Orleans, protested, and notice given. It is not very seriously insisted that these protests, etc., were valid and sufficient to fix the liability of tbe defendant. No legal excuse is shown for *300 tlie ladies of tlie plaintiff between tlie 6tli of June, 1862, and tlie 31st of March, 1863, when, according to the proclamation of the President of the United States, intercourse was lawful between the two cities, and when, as the proof shows, it was both practicable and safe.
The defense relied upon by the defendant is, that by the law merchant, he is discharged from all liability on this bill by. the laches of the plaintiff. ' Upon the foregoing facts he certainly would be, but the plaintiff contends that he has made himself liable by a subsequent promise to pay the bill, “having full knowledge,” as averred in the declaration, of the want of due presentment, protest, and notice, “and that he was discharged by reason of such laches, from liability to pay said bill.” The plaintiff contends, further, that this is purely an accommodation bill, and that no demand; protest, and notice was, in such case, necessary to fix and determine the liability of the defendant. We will consider these propositions in the order in which they are stated.
In regard to defendant’s promise, after the protest of May and July, 1865, it is shown by the testimony of the plaintiff, and by that of the defendant, also, that the defendant did several times promise to pay the bill, and had actually made arrangements with his Memphis banker for the purchase of the notes of the plaintiff for that purpose. On the occasion of one of these said promises to pay the bill, he, the defendant, was asked by the counsel for the plaintiff if he had consulted his counsel as to his liability on the bill. He answered that he had not. Afterwards, in the winter of 1861, the defendant being very ill, sent for his counsel to advise with him about his business affairs, and in tho course of this interview, he was advised by his counsel that he was not bound upon the bill, and that in law he -was discharged by the laches of the plaintiff. After this he refused to pay the bill, and continually denied his liability. He states that when he made the promise he thought he was bound in law to pay, and when he ascer *301 tained that he was not, he refused to pay. This fact is fully shown in the testimony of both the plaintiff and the defendant. The court charged the jury, in substance, that if the defendant’s promise to pay was made in ignoram.ce of the legal effect of the laches of the plaintiff, by which he was, in law, discharged from all liability on the bill, the promise would not be binding upon him. And such is the settled doctrine of this court. The plaintiff has cited the decisions of several courts, both English and American, holding otherwise; and it seems that the current of authority outside of Tennessee, maintains the opposite view. In the case of Spurlock v. The "Union Bank, 4 Hum., 336, decided in 1843, this court held that to render an indorser liable who is discharged by the neglect of the holder to give notice, there must be satisfactory proof to show that the subsequent promise to pay was made with a full knowledge of the discharge. It must not be left to surmise. It is wholly immaterial whether his ignorance of his discharge was the result of his ignorance of the law or the facts which discharged him. In that case the court say, Turley, J., delivering the opinion: “We cannot say from the proof that the promise and admission were made upon full and ample knowledge of his discharge from his liability as indorser. The mass of mankind know but little of commercial usage upon commercial paper, and upon questions of liability, have to depend upon legal advice. . if an indorser believes facts to exist which charge him, which do not exist, or if he believe facts which do exist charge him, which do not charge him, and in a-misapprehension as to the operation of the law upon his case, thus supposed, he promised to pay, he will not be held to his promise.” Id., 337.
The same doctrine was announced in Golladay, Cheatham &; Co. v. The Bank of the Union, 2 Head, 58, in these words: “If the drawer of a bill, with the knowledge that he is discharged from its payment for want of notice, acknowledge the debt and promise to pay it, he thereby *302 waives demand and notice, and is liable for the same;” and it is again followed in Ford v. Dallam, 3 Cold., 67. Mr. Story questions the soundness of the opposite doctrine in liis work on promissory notes, while admitting that it is the general doctrine of the English and American courts. Story on Prom. Notes, secs. 275, 362. Though-it does seem'that the general current of authority in other states is the other way, yet we find many respectable authorities maintaining the doctrine of our own court. Thus, in the case of Low v. Howard, 10 Cush., 159, where tire judge at nisi prius, charged the jury that, though it was generally time that a promise by an indorser to pay the note when there had been no demand and no notice of discharge, would be held to be a waiver thereof if these facts were known to him, yet tire rule would not apply to a case where other material circumstances existed, the knowledge of which was essential to a full understanding of his rights and obligations. Shaw, Oh. J"., said: “We think tire directions were right.”
The legal foundation of the doctrine of waiver is, that a party knowing his rights, voluntarily consents to forego them. Knowledge of all tire material facts on which those rights depend is essential to a valid waiver. In Warder v. Tucker, 7 Mass., 449, it was said that, although the defendant, when he first received notice from the plaintiffs of the protest of the bill, considered himself as liable by law to pay the plaintiff the amount of it, yet his ignorance of the lav/ shall not bind him to fulfill an engagement made through mistake of law.” In Freeman v. Boynton, 7 Mass., 483, Parker, J., said: “Nor will any supposed acknowledgment of the indorser that he was liable to pay tire note, avail the plaintiffs in the -present case'. The facts reported do not show any direct promise to pay, and even if they did, it is well settled that a promise to pay, under such circumstances as show an ignorance that the party was legally discharged, is without consideration, and void — citing Fleming v. McClure, 1 Brev. So. Rep., 428. In Miller v. *303 Hackley Auction, N. Y. S. C. Rep., 68, it was said, by Thompson, J., “that a promise may amount to a waiver in a case like the present, enough must appear to render it justly presumable that the defendant at the time knew the fact of the want of notice and also knew his legal rights.'-'
AYc are aware that in many of the commercial states this doctrine has been repudiated, but we are inclined to think it is founded in good reason, and is certainly most consonant with the most obvious rule of right, that a party shall not be held to have waived a right if he did -not know that it was right. It has, at all events, been the law of this state for nearly forty years, and has been followed in. all orn-eases, reported and unreported, in which this question was involved, and we are not disposed to unsettle our decisions at this late day by departing from it.
It is insisted that the acceptance in this case was purely an accommodation acceptance, and that the defendant was not entitled to notice of demand and nonpayment, as he could not be injured by the want of it. This issue is tendered by the second count of the declaration, which excuses the want of protest and notice, on the ground that it was purely an accommodation acceptance, and that from the time of the drawing of the bill and henceforward, and until maturity, the said acceptors had not in their hands any funds or effects of defendant, nor had they received from defendant any consideration for the payment of said bill, nor has the defendant sustained any injury or damage by reason of his not having notice of the nonpayment of said bill. Upon this issue, as we have seen, the proof establishes that between the defendant and the acceptors in this case there had been a long series of transactions; that they were the factors of the defendant; had received from him, at different times, large consignments of cotton; that the defendant had, from time to time, drawn upon said cotton; that they had long been in the habit of accepting his drafts; that at the time the bill in controversy was drawn, and for *304 at least fire months of the time while it was running to maturity, they had in their hands not less than 230 bales of cotton, and that they had standing instructions to sell the cotton to meet this bill. The court charged the jury that if the defendant had reasonable grounds to believe from past transactions between himself and the acceptors, or from other circumstances, that they would pay the bill at maturity, then, although it might have been an accommodation acceptance, the drawer would be entitled to demand, protest, and notice. The court further charged that whether the acceptance w^as an accommodation acceptance or not, the drawer was entitled to demand, protest, and notice, if you find that at the date the bill was drawn the drawer had cotton in the hands of the acceptors to meet it, whether the'cotton ivas insufficient or not, or whether it ivas subsequently destroyed or not. It is insisted that by this and other portions of the charge, the court withdrew from the consideration of the jury the question whether this was, or was not, an accommodation acceptance. The court has sufficiently and very plainly defined what is an accommodation acceptance, and what facts are necessary to he found to exist in otder to make it an accommodation acceptance, and has properly drawn the distinction between a technical accommodation acceptance, in which no protest and notice ivere necessary, and a quasi accommodation acceptance, in which it is a well-settled doctrine of the law merchant that certain elements may enter into it which in all such cases entitles the party to demand, protest, and notices What constitutes an accommodation acceptance is not properly a matter of fact for a jury, but a conclusion of law upon a certain state of facts to be found by the jury. It seems to us that the question has been properly submitted to the jury in this case. The best key to the solution of the question whether the drawee of a bill of exchange has a right to demand, protest, and notice is, at the time the bill was drawn, did lie have a right to draw? We are of opinion that the acceptance in this case was not *305 an accommodation acceptance in the sense insisted on by the learned counsel of the plaintiff, and that the defendant was entitled by law to the common prerequisites of due demand, protest, and notice to fix his liability upon this bill. It is an elemehtary principle which seems to< be recognized in all the books, that if the drawer had reasonable ground to expect that the bill would be honored, then he had a right to draw, and if he had a right to draw, he had a- right to expect due notice of protest and dishonor. The reasonableness of his expectation is, ordinarily, a question of law, but when the proof is contradictory and the facts equivocal, it is a mixed question of law and fact.
A prominent instance given in the books where the drawer may have good reason to expect that the bill will be honored, is where he has consigned goods to the drawee, although the consignment ¡may, by accident or otherwise, not have come into the possession of the drawee, or may, by depreciation in value or other loss, have become insufficient to cover the amount of the bill. 1 Pars. Bills and Notes, 535, 540; Oliver v. Bank of Tenn., 11 Hum., 74; 2 Brock., 20; 9 Gill., 350; 3 La. Ann., 385; 8 Pick., 79; 10 Pet.., 572. Hr. Edwards, after discussing at length the question, and especially as' to the exceptions to the general rule that notice of the dishonor of the bill must be given to tbe drawer, proceeds to discuss the exception where the drawer has no funds or effects in the bands of the drawee, and says that to this exception there are some important modifications: “If the drarwer has made, or is making, am assignment to the drawee and draws before the consignment comes to hand, or if the goods are in transitu, but the hill of lading is omitted to be sent to the consignee', or the goods are lost, or if the drawer has any funds or property in the hands of the' drawee; or there is a fluctuating balance between them in tire course of tlieir transactions, -or if there is a running account between the draurer aud the drawee; and the latter has been in tbe babit of accepting the bills *306 of tbe drawer without regard to the state of accounts between them, or if the drawer has a reasonable expectation that the bill will be paid, he is entitled to notice of dishonor. In all such eases the drawer is considered as justified in drawing. . . . And where the drawing is a fair commercial transaction, in which the drawer has a reasonable expectation that his bill will be honored, he is entitled to the same notice as a drawer with funds, or authority to draw without funds.” Edwards on Bills, 601, 602. “And again/’ says the same author, “if the drawer ( acts upon a fair presumption, he is entitled to notice, notwithstanding it turns out that he iiad, in fact, no funds on which to draw; as, where he draws upon consignments of goods made from time to time and the want of funds to meet the last bill proceeds from a fall m the price of them. If he have effects in the hands of the drawee at any time before the bill matures, he is entitled to notice, though they bei not sufficient to meet the bill.” lb., 603. Mr. Cbitty states the doctrine thus: “If at any time between tbe drawing and present ment and dishonor of a bill, the drawee had some effects of the drawer in his hands, though insufficient to pay the amount, he will, nevertheless, be entitled to notice of the dishonor. Bor this case, says the author, 'differs from that where there are no effects whatever of the drawer in the hands of the drawee at the time, because tbe drawer must know that he is drawing upon accommodation, and without any reasonable expectation that the bill will be honored. But if he hare effects at the 'time, it would be dangerous and inconvenient, merely on acount of the shifting of a balance, to hold notice not to be necessary. It would be introducing a number of collateral issues upon every case of a bill of exchange, to examine how accounts stood between the drawer and drawee from the time the hill was drawn to the time of dishonor. Actual value in the hands of the drawee at the time of drawing is not necessary to entitle the drawee to notice. If he had consigned goods to pay the bill, though they may not have come to hand *307 at the time of presentation for acceptance. Chitty on Bills, 357a, 359.
The drawer is entitled to notice of dishonor, says Smith’s Mercantile Law, if he had effects on their way to the drawee, or if, on taking up the bill, he could suei the acceptor or any other party, or had effects in the hands of the drawee at the time the bill was drawn, or when it was presented for accqt tunee, or afterwards, but before it became due, though the effects ■were less than the amount of the bill, and the drawer was indebted to the acceptor in a larger amount than their value; in a ■word, if he have any reasonable ground to' expect that the bill will be paid, he is entitled to notice. Smith’s Mer. Law, 252; Bagnell v. Andrews, 7 Bing., 109. This seems to be the universal doctrine of the law merchant on this subject.
It is argued that the defendant was not in any way injured by want of notice in this case, and hence no notice was necessary. ITow do we know that? What right have we to speculate upon an abstract question like that- when we have the law thus plainly written? It is the introduction of jxxst such collateral issues as Mr. Chitty deprecates in the above cited passage, which would destroy the unity and symmetry of our system of commercial jurisprudence, and incumber the law merchant with such embarrassment as would greatly depreciate its value to the commerce of the world. The opposite doctrine from that which governs this case is very well established and well understood.
It is thus stated by Mr. Story: “If the drawer has no right to draw the bill, or no reasonable ground to expect the bill to be accepted, he is not deemed entitled to notice of the dishonor thereof, for it was his own fault to draw the same, and, correctly speaking, he cannot he said to have suffered any loss by the want of notice.” Story on Bills, sec. 311; Oliver v. The Bank of Tenn., 11 Hum., 74; Mobley v. Clark, 28 Barb., 390. But that, is not this case, and we can scarcely conceive of two' doctrines that stand in clearer antithesis than that last stated, and that we *308 have discussed, as in our judgment, plainly applicable to the facts of this case.
Affirm the judgment.