Rives, J.
It does not seem material to consider or settle the question of pleading raised by the demurrers to the original and amended declarations in this case. The common counts in indebitatus assumpsit, which were sustained, would have sufficed to sustain a recovery un *398 der the authority of Bank of U. S. v. Jackson’s adm’x, 9 Leigh 221. The contract was one of privity between these parties, and sprung out of the payment of money by one to the other. Had the ease been submitted to a jury, it would have conduced to a clearer development of the issue, if the plaintiff had been allowed to count specially, as he did in his amended declaration, upon the particular facts of his demand. The practice of relying on these general counts, was disapproved and discouraged at an early date in the case of Wood v. Luttrel et al. ex’ors of Carr, 1 Call 232, 240, by Judge Pendleton, who used this just and emphatic language: “I cannot forbear to mention that I do not like this new practice of general counts much, as they tend to surprise the other party without giving him the opportunity of preparing for a full defence.” But in this case the parties waived their right to have a jury for the trial of this cause, and agreed that the whole matter, of law and fact, should be heard and determined by the court. Inasmuch, therefore, as the court held and was well justified in holding, that a recovery, if at all, might bé had under the common counts; and proceeded to hear and determine the case upon its merits under these counts, we are relieved of the necessity of adjusting the pleadings with any technical nicety. There was, perhaps, no other reason for sustaining the demurrer to the amended declaration, save that it did not, in the opinion of the court, set out a legal cause of action; a conclusion also reached in the judgment given for the defendants upon the facts.
We are therefore remitted to the enquiry whether the contract in this case was capable of being asserted in a court of law. The parties to this contract were all alike residents of the Confederate States. In February 1863, the plaintiff in error purchased of the defendants three several drafts of the Farmers Bank of Virginia upon the New Orleans Canal and Banking Company, *399 "bearing date the 26th August 1862, for the sum of two thousand dollars each. Prior to the date of these drafts, the city of New Orleans had been taken by the ' forces of the United States, and so “ occupied and controlled” by them as to be excepted out of the terms of the president’s proclamation of 16th August 1861, that had declared Louisiana, along with other southern States, in a state of insurrection against the United States. The taking of the city was followed by the president’s proclamation of 12th May 1862, raising the blockade of its port from and after the 1st day of June 1862; and the decisions of the Supreme court have fixed the 6th of May 1862 as the period of the full and final restoration of the city to the jurisdiction and authority of the United States. These facts disclose a ease of a contract of endorsement between citizens within the insurrectionary districts, during the pendency of hostilities, of a bill drawn by a bank in Virginia upon a bank in New Orleans, that was then claimed and recognized as within the rightful territory of the United States. This statement is sufficient to reveal, in its true light and bearing, the important question upon which we have to pass in this case. In another part of this investigation, I may have to recapitulate other circumstances relevant to other topics of this discussion; but for present purposes, I have stated all that is necessary to possess us of the points made in this case.
How it is alleged that the purchase of this bill was illegal and void on two grounds: First, that it was a trading, condemned and avoided by the laws of nations in case of international wars, which, for the purposes of this argument, are assumed to rest upon the «ame principle and reason as our late internal war; and secondly, that it was prohibited and annulled by the act of congress of July 13, 1861, interdicting “all commercial intercourse” between the inhabitants of the in *400 surrectionary districts and the citizens of the rest of the United States. These positions are plainly contra- • dietory; the one referring the claim to the decision of international law, and the other to the decision of municipal law. They cannot both stand together: a choice must be made between them. If the case rests on international law, the municipal is excluded; and e converso, if within the pale of the municipal, it is without that of the international.
Hence, our first enquiry should be, whether the contract relied on in this case is affected by, or within, the purview of the law of nations touching dealings between alien enemies; and herein we have to consider at the outset the assumption already alluded to; namely, that our late civil strife was attended with all the legal incidents and consequences of a war inter gentes. In calling this an assumption, I do not mean to treat with any disrespect the argument of the counsel for the appellees ; but I rather indicate thereby the strong and decided sense I entertain of what I humbly submit it can be satisfactorily shown to be. I understand the position to be, that there is no distinction upon reason or authority, between public war of whatever sort and international ¡¡war, in the vacating of contracts between individual^citizens of belligerent countries flagrante hello. That we may more critically examine and determine the soundness of this position, let us first acquire a precise and definite idea of this important tenet of the law of nations. Its indispensable attribute is, that it should be a contract between “ alien enemies,” because the doctrine is- founded on the principle, that a declaration of war puts not only the adverse governments in their political capacity at war, but renders all the subjects of the one the enemies of the subjects of the other. Vattel, bk. 3, c. 5, § 70; also note to Clemontson v. Blessig, 11 Exch. R. 135. Hence, “ no valid contract can be made, nor any promise arise, by implication of law from any *401 transaction with an enemy,” says Justice Clifford, in Hanger v. Abbott, 6 Wall. U. S. R. 584.
These conditions are all fulfilled in the case of foreign wars between independent nations, because it can be aptly said of them, that a state of war is contradictory of a state of commerce, and that there cannot be war for arms and peace for commerce. Considerations of public safety, imperiously forbid all contracts between alien enemies; so that after the termination of the war, during which they were made, the illegality of the transaction may be set up as a valid defence against an action founded upon any such contract. But are such conditions found in a war waged between citizens of a common country; and is this doctrine at all applicable to the status or the dealings of fellow-citizens embroiled in a civil war? "Under our complex system of State and Federal governments, the constitution of the United States is not overthrown by the insurrection of any portion of the people, however formidably arrayed or efficiently organized under all the facilities of revolt arising out of their separate organizations into States, under all the forms and with all the powers necessary to command the resources and services of their inhabitants. Whatever may have been the theory, on which this rebellion was projected and justified, it has confessedly yielded to the grand arbitrament of arms; and we need not now be disquieted or harassed by any doubt that the constitution of the United States reigned supreme over all the States and all the citizens during the whole of this deplorable conflict and since, with such exceptions only as are due to the clash of arms and the necessities of State. We shall in vain look through the whole range of decisions of the Supreme court for the slightest intimation that this rebellion had affected the supremacy of the constitution; or released the revolted States or their citizens, from its authority or their al *402 legianeeto it. It is true that the war was of such dimensions, and was so organized, under the auspices of. the revolted States, into a new and separate Confederacy that the government of the United States was compelled to waive some of its strict and theoretical rights over the insurgents. It would have been idle to send out with its armies, as was done in the case of the whiskey insurrection in Pennsylvania, civil officers, to whom captured insurgents might be turned over for arrest, trial, conviction and punishment. It was the dictate of necessity and policy to recognize the Confederate States as a government defacto; to concede belligerent rights to them; to acknowledge a state of internal war; to treat captives, both on land and sea, as prisoners of war, and provide for their exchange; to declare a blockade .of the ports in the insurrectionary districts; and assert under the law of nations the rights of capture and prize jure belli. These concessions were properly made to mitigate the rigors of this fratricidal war, and conduct more effectively and humanely to the suppression of the revolt. They were conceived in the spirit of the exalted teachings of the most enlightened and accredited publicists. Vattel, bk. 3, ch. 18, § 294, recommends that “the common laws of war — those maxims of humanity, moderation and honor, which we have already detailed in the course of this work— ought to be observed by both parties in every civil war. Por the same reasons, which render the observance of those maxims a matter of obligation between State and State, it becomes equally, and even more necessary, in the unhappy circumstance of two incensed parties lacerating their common country. Should the sovereign conceive he has a right to hang up his prisoners as rebels, the opposite party will make reprisals; if he does not religiously observe the capitulations, and all other conventions made with his enemies, they will no longer rely on his word; should he burn and ravage, *403 they will follow his example; the war will become cruel, horrible, and every day more destructive to the nation.” 'While therefore in the pursuance of these • wise and humane maxims, the government of the United States departed from the theory striciissimi juris in its constitutional suppression of this insurrection, there was never in any authoritative quarter an admission that the insurgents, by reason of being acknowledged as quasi enemies to the extent of these concessions, were not amenable to the constitution and the laws. This did not in fact involve any contrariety in the status thus ascribed to them; and when such was alleged in the Prize cases, 2 Black. U. S. R. 685, 670, Justice Grier, with no little warmth, denounced it as “ the anomalous doctrine, which this court are now, for the first time, •desired to pronounce, to wit: that insurgents who have arisen in rebellion against their sovereign, expelled her courts, established a revolutionary government, organized armies, and commenced hostilities, are not enemies, because they are traitors; and a war levied on the government by traitors, in order to dismember and destroy it, is not a war, because it is an insurrection.”
But if by the intendment of law the constitution of the United States pervaded the whole land, notwithstanding the insurrection, and was in theory the supreme law to insurgents as well as loyal citizens, the municipal law went along with it, and governed contracts. To term the citizens of the Confederate States enemies, is far from being tantamount to calling them “alien enemies.” We are told, 2 Black. U. S. R. 274, that “the word ’enemy’ is a technical phrase peculiar to prize courts, and depends upon principles of public policy, as distinguished from the common law; and besides, that citizens of the Confederacy, while traitors, for having cast off their allegiance and made war on their government, are none the less ‘enemies.’” All this is conclusive to show that the courts have never for *404 one moment lost sight of, or relinquished, the principle-of the nullity of the attempted withdrawal of the southern States, and the supremacy of the constitution and the laws in spite of it. Upon what principle and reason then shall we be required in this ease to take rebellious subjects out of the pale of a constitution, which they have failed to overthrow, and submit their dealings and contracts to international rather than municipal law 1 It would seem to be enough to reply, that the correct theory of our disastrous conflict does not admit of the idea that the parties to it were foreign and independent nations, and the citizens of the one “ alien enemies” respectively of those of the other.
Upon principles of reason therefore, distinguishing-the case of our late war from that of a war inter gentes, I conclude that this case does not come under the interdict of international law against contracts between “ alien enemies.” But we are told that we are not left to the conclusions of reason upon this subject, but are-shut up to the decisions of the Supreme court of the United States, that are alleged to apply this doctrine for the vacation of contracts between opposing belligerents pending the war to our late war, as fully as if it had been an internatioaal war. This assertion cannot rest upon anything more than analogy; but, even thus qualified, it excites my unfeigned surprise. I shall therefore take up all these cases in their order that have been referred to, and ascertain whether they are-susceptible of being used as authority for a position, which I have endeavored to show is contrary to reason.
The first reference is to the Prize cases, 2 Black U. S. R. 635. The chief controversy in those cases was-as to the right of the president, in the absence of any act of congress declaring or recognizing a state of war, to proclaim a blockade of the ports in possession of the States in rebellion. There was a difference of opinion among the judges on this point; but all con *405 ceded, the right to exist after the act of 13th July 1861, authorizing the president to interdict all trade and intercourse between the inhabitants of the States in insurrection and the rest of the United States. The court, however, was of opinion that the right to institute this blockade; pertained to the president jure belli, and, therefore, upheld the authority and legality of his proclamation of blockade of 19th of April 1861, although prior to any congressional recognition of the war.
Another proposition was also laid down in these cases, namely, that property of persons within the Confederacy was to be deemed enemy’s property without reference to the individual status of the owner, and, therefore, lawful prize. These were cases affecting the rights of the United States as sovereign, and of captors claiming under its laws, where, as I have already shown, the government had chosen to follow the law of nations rather than exercise its municipal right to close its ports. Thus, in the case of The Circassian, 2 Wall. U. S. R. 135, the chief justice observed that “ the government of the United States, involved in civil war, claimed the right to close, against all commerce, its own ports seized by the rebels, as a just and proper exercise of power for the suppression of attempted revolution. It insisted, and yet insists, that no one could justly complain if that power should be decisively and peremptorily exerted. In deference, however, to the views of the principal commercial nations this right was waived and a commercial blockade established.” This declaration of one who was a member of President Lincoln’s cabinet, is an authoritative disclosure of the motive for exchanging the municipal right, for the belligerent right under the law of nations. But this falls far short of the pretension that has been founded on these cases. It in fact receives no countenance from them. But resort is had to certain *406 incidental remarks of Justice PTelson, who gave the dissenting opinion in these cases. He is depicting the • consequences of war, and enumerates among them the invalidity of contracts flagrante bello. The statement of the doctrine was perfectly true in the connection in which he made it; but the doctrine was in no wise involved in the adjudication of those cases; and cannot now be wrested from the context, and made to apply to the quite different question we are now making, without an inexcusable perversion of his “ obiter dicta.”' And yet this is all the analogy between those cases and the one at bar.
PText comes the case of Mrs. Alexander’s cotton, 2 Wall. U. S. R. 404. This cotton was captured on land by a naval foi'ce of the United States in the spring of 1864, and was libelled as prize of war; but it was held not be “maritime prize,” and to be embraced by the: act of congress of March 12th, 1863 (12 Stat at Large 591), providing for the collection of abandoned property, &c. — whereby such property captured during the rebellion should be turned over to the Treasury Department to be sold and the proceeds deposited in* the national treasury, so that any person asserting-ownership of it might prefer his claim in the court of' claims under the said act; and on making proof to the satisfaction of that tribunal that he had never given aid or comfort to the rebellion, have a return of' the net proceeds decreed to him. In this case as in the Prize cases, the proposition was again reiterated that “ the court could not look into the personal character and dispositions of individual inhabitants of' enemy territory.” — “We must be governed,” says the Chief Justice, “by the principle of public law, so often announced from this bench as applicable alike to civil and international wars, that all the people of each State or district in insurrection against the United. States, must be regarded as enemies, until by the ac *407 tion of the legislature and the executive, or otherwise, that relation is thoroughly and permanently changed.” But this language, broad and comprehensive as it is, must be confined for purposes of interpretation to the case in hand; and that was one between the rights of the government on the one hand, and those of a citizen on the other hand. It did not relate to controversies between individuals on the opposite sides, or tend to admit or tolerate the plea of ‘alien enemy’ in suits between such parties after the cessation of the war. Hothing breeds more confusion of ideas than to seize on a particular expression, tear it from its context, and then insist on the universality of its meaning, and its application to cases not in the mind of the writer, because of its capacity literally to embrace them. Without proper discriminations, we mnst continually fall into serious errors in weighingand interpreting judicial decisions; and it is through the lack of such precaution, as it seems to me, the notion prevails that this and the Prize cases attribute to civil wars as well as to international wars this faculty of annulling contracts between belligerent individuals.
The Ouachita Cotton case, 6 Wall. U. S. R. 521, to which we were next referred, does not relate to the question we are now considering. It was wholly under the municipal law, and involved the construction of the act of congress of July 13th, 1861, and the subsequent .proclamation of President Lincoln in- pursuance of it, under which it was held, that purchases of cotton from the rebel Confederacy, by citizens or corporations of New Orleans, and libelled during the war, were void. These measures were regarded as “restoring New Orleans after its occupation by the military forces on the 6th of May 1862, so completely to the national authority as to clothe its citizens with the same rights of property, and subject them to the same inhibitions and disabilities as to commercial intercourse with the terri *408 tory declared to be in insurrection as the inhabitants of ** the loyal States.” This, I presume, might also have the case had these belligerents been foreign and jn(jepen¿en^ nationg in this predicament towards each other, under the authority of The Hoop and The Bella Guidita, 1 C. Rob. Adm. 196 and 207, and United States v. Rice, 4 Wheat. R. 246; so that Justice Swayne, apart from the act of congress and the proclamation of the president’, justly regarded it as “the result of well-settled principles of public law.”
The last case that has been cited for the appellees on this point is Hanger v. Abbott, 6 Wall. U. S. R. 534. It was there decided that the war had the effect of suspending the statute of limitations in the States, so that the time during which the courts in the lately rebellious States were closed to citizens of the loyal States, is, in suits brought by them since, to be excluded from the computation of the time prescribed by such statute, though exception for such cause, be not provided for in the statute. This doctrine is deduced from, and justified by, the principle, that while war does not annul an antecedent debt, it suspends the remedy therefor, so that the right and the remedy are both revived by peace; but this would be nugatory should the war last for the period of limitation, and there be nothing to stop the running of the statute. To give efficacy therefore to the principle, that the return of peace brings with it both “ the right and the remedy,” it is necessary that the statute should be suspended for the war; or else, as it is here said, “the citizens of a State may pay their debts by entering into an insurrection or rebellion against the government of the Union, if they are able to close the courts, and to successfully resist the laws, until the bar of the statute becomes complete.” This is, in truth, a precedent for removing obstacles from the path of the creditor after the war; and I do not see how it can be tortured into an authority for an *409 nulling all war debts and contracts sued on after peace. It is true in this case, as in the Prize cases, much is said upon the general consequences of war in the prohibition of all trading, negotiation, communication and intercourse between the citizens of one of the belligerents with those of the other, without the permission of the government; but it has only a remote and incidental bearing upon the point in issue, is, in truth, a mere preface to the discussion of it, and in no respect enters into the body of the judgment. While, therefore, I do not dissent from these declarations, but, on the contrary, accept them as a part of the law of nations, I do humbly protest against the effort to make them authority in reference to a civil war or any other public war, except a war inter gentes.
I have thus carefully canvassed and sifted these authorities, and have not been able to find anything in them that assimilates civil to international war in its avoiding trading and contracts during its pendency. Had such an incident belonged to civil war, why is it that no instance of it can be found, after the most diligent search in the records of judicial proceedings, during such wars? and where was the necessity of the act of congress, if in our intestine warfare the public law of nations applied to it, and effected the same end ?
But all this is mere negation. Positive and direct authority exists against this pretension of the appellees, and that in a decision of the Supreme court. In it, I have found the very basis, and staple of the arguments I have been advancing. I allude to the case of Mauran v. Insurance Company, 6 Wall. U. S. R. 1. It arose upon a policy of insurance upon a ship afterwards captured by a Confederate vessel; which policy had a marginal warranty, “ free from loss or expense by capture.” To determine whether this loss arose from “ assailing thieves” or “ pirates,” for which the insurer was bound to pay; or from a cap *410 ture, the risks of which the assured took upon himself by his warranty, made it necessary for the-court to ascertain and define the character of the Confederate States ' government. ' It accordingly did so, and declared it to be a government defacto. Justice Kelson, whose language in the Prize, cases was quoted by the counsel for the appellees, delivered the opinion of the court in this case, and laid down their theory of our late struggle in the following striking passages: “"We-agree that all the proceedings of these eleven States,, either severally or in conjunction, by means of which, the existing governments were overthrown and new governments erected in their stead, were wholly illegal and void; and that they remained after the attempted separation and change of government, in judgment of law, as completely under all their constitutional obligations as before. The constitution of the United States, which is the fundamental law of each and all of them,, not only afforded no countenance or authority for those-proceedings, but they were, in every part of them, in express disregard and violation of it. Still, it cannot be denied but that by the use of these unlawful and unconstitutional means, a government in fact was erected greater in territory than many of the old governments in Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of unexampled dimensions, and during all which time, the exercise of many belligerent rights were either conceded to it or were acquiesced in by the supreme government; such as the treatment of captives, both on land and sea, as prisoners of war; the exchange of prisoners; their vessels recognized as prizes of war and dealt with accordingly; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded and the blockade maintained by *411 a suitable force and duly notified to neutrals, the same as in open and public war. We do not enquire whether these were rights conceded to the enemy by the laws of war among civilized nations; or were dictated by humanity to mitigate the vindictive passions growing out of a civil conflict.” Again in White v. Cannon, 6 Wall. U. S. R. 443, it is said that “the objection that the judgment of the Supreme court of Louisiana is to be treated as void, because rendered some days after the passage of the ordinance of secession of that State, is not tenable. That ordinance was an absolute nullity, and of itself alone, neither affected the jurisdiction of that court or its relation to the appellate power of this court.” If then we accept these opinions of the Supreme court as the law of the land, I do not see, how the contracts of the citizens of a common country, though harassed by civil war, are to fall under the ban of international law as to contracts between alien enemies in time of war. To impute the doctrines of * alien enemy’ to the relations of a people under the same constitution of government in the eye of the law, though engaged in an insurrectionary war, would be in flagrant opposition to these decisions, which we are bound to respect and follow.
. That the understanding of the country, also conforms to the state of the law, as thus expounded, we have striking proof and an impressive example in the general acquiescence in the nullity of the sequestration or confiscation laws of the Confederate States. A greater hardship and loss cannot well be conceived; and yet I have not heard of the first case in this State, of an attempt to resist at law the repayment of a debt or the restoration of property, which had been sequestrated or confiscated under this law of the Confederate States. And yet if this pretension of applying international law to the case, be correct, this law stands justified by the strict rights of war; and is really valid, *412 though not approved by the practice and rules of later times. But it seems the question was made before the Circuit court of the United States at Baleigh, in which the chief justice reviewed the very points that have been made in tbe argument here; and fully sustained the views I have taken. The pamphlet containing his opinion — Shortridge et al. v. Macon — is before us. He was met there, as we are here, by the assertion that the decisions of the Supreme court, already cited, declared the principle that all the doctrines of international law as to war inter gentes were applicable to tbe powers and rights of the two governments, and the dealings of the respective citizens of each, with those of the other; so that a state of civil war, like a state of international war, would validate acts of confiscation, and also stop interest on debts thus deemed to be foreign. But he distinctly disclaimed and repelled this interpretation of these cases, and gave judgment for the debt, interest, as well as principal.
After a succinct recapitulation of the points settled by the Supreme court, he adds with emphasis: “But there is nothing in that opinion which gives countenance to the doctrine which counsel endeavor to deduce from it; that the insurgent States, by the act of rebellion, and by levying war against the nation, became foreign' States, and tbeir inhabitants alien enemies.”
I have thus taken much pains to ascertain if this pretension of the appellees could derive any support from the decisions of the Supreme court. It seemed to me, under the circumstances, a strange quarter to seek for it; for if it can be found there, it must be allowed that this august tribunal has gone far towards rehabilating the doctrine of secession, and giving life to the Confederacy in its ashes. And for what ends of justice, I demand to know, are we required to vamp up this obsolete theory of a separate and independent ex *413 istence of the late Confederacy ? The parties to this controversy were citizens of this Confederacy; and contracting under that faith, what merit have the ap-' pellees in this defence? It must be allowed that this defence is curiously constructed; it consists in part of the law of nations, and in part of the municipal law; of the former, so far as the incapacities growing out of international war, are concerned; and of the latter, when it becomes necessary to invoke it for the re-annexation of New Orleans, a part of the Confederate territory, to the United States. Upon the theory of a separate Confederate nationality, no act of mere military occupation, nor law of the congress of the United States, could avail to withdraw this city from its sovereign so as to make its inhabitants, for purposes of contract, alien enemies to other subjects of the same sovereign; although under the doctrines of The Hoop & Bella Guidita, already cited, it might not be allowable for the latter to ship supplies to the former. If required, then, to stand exclusively upon their theory of an international war, unassisted by the laws of congress, the appellees, and all the other parties, in interest, to this controversy, including the Canal and Banking Company of New Orleans, would be inhabitants and citizens of one common country; and there could be no pretext for imputing the relations of alien-age or hostility to any. But, to make out this defence, another ingredient is wanted; and that is found in the laws of congress and the proclamation of the president of the United States, whereby New Orleans is transferred from the dominion of the Confederacy to that of the United States. Such a mixed and incongruous plea, therefore, does not challenge my particular regard, nor offer any peculiar temptation to be seduced into the avowal of doctrines, that might prove hazardous to the business of life in times of civil commotion. Bor my part, I feel it to be a duty within my province, *414 to protect, as far as practicable, the contracts of men from being affected by internal disturbances, so that the stream of commerce may not be impeded or diverted, nor the faith of contracts dissolved by intestine wars.
If I have not erred in the positions I have so far advanced, I have succeeded in excluding this case from the pale of the law of nations. I am therefore relieved from the necessity of saying anything as to the numerous authorities that were cited on this head; I read them all with an interest and attention due to the gravity of the doctrine, and its able and satisfactory exposition in these eases, but, in my view, they have no legitimate application to this case.
Let us now turn to the only remaining branch of our enquiry, and see whether this action is defeated by the law of congress. It may seem hard to subject a contract between confederates during .the war to an act of congress, of which it is reasonable to suppose they might not have had cognizance; but such a consequence necessarily attends the overthrow of the usurped governments. The act in question (July 13th, 1861,) authorized the president by proclamation to declare the inhabitants of any State, or part thereof, to be in a state of insurrection against the United States, whereupon “ all commercial intercourse by and between the same, and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful, as long as such condition of hostility shall continue.” This act was followed on the 16th August 1861 by the proclamation of the president, declaring, among other things, “ that all commercial intercourse, &c., is unlawful, and shall remain unlawful until such insurrection shall cease, or has been suppressed.” The effect of these two measures was to suspend intercourse during the continuance of hostilities. I shall not stop to enquire what was the character of “ the commercial intercourse” thus prohibited, whether it was aimed at the negotiations of *415 trade as within, the mischief, or merely at the locomotive commerce, as more palpably indicated by the context, which is restricted to “ all goods and chattels, ■ wares and merchandize.” I am willing to. concede in view of judicial decisions upon the cognate doctrine in the law of nations, that the interdict was levelled at all contracts that might tempt to the violation of this prohibitory policy. But it is indispensable to discriminate between the edict of international law and the terms of this statute. The former, we have seen, annulled all •contracts within the prohibited class, so that no action could be maintained upon them after, the termination of the war; not so, however, with this act of congress; it is merely suspensory. Had congress thought proper to follow the law of nations in this respect, it could and would have done so; but in a tender and considerate deference, doubtless, to the peculiarities of the conflict, it chose a milder course, and merely suspended the right and the remedy during hostilities. It did not simply declare “ commercial intercourse” unlawful, and stop there, leaving it to be inferred, as an intendment ■of law, that every act of such intercourse was therefore void, and incapable of supporting an action after the war. But the prohibition is made to depend upon •“the condition of hostility,” so that when the latter ceases, the former is removed, and a contract, unlawful in its inception, ceases to be so upon the return of peace. This, I take it, is the plain and unambiguous meaning •of the act.
This bill was purchased by the appellant in February 1863, when New Orleans, where it was payable, had .reverted to the United States. Grant that this transaction was unlawful at that time, the illegality was temporary and contingent, .for both the law and the proclamation declared that it should cease with the •suppression of the insurrection. Ho step need to have been taken before that time to fix the liabilities of the *416 parties to the bill. Had there been an understanding that this negotiation should await the termination of the war, it would have been as innocent as an assignment for value of the obligation of a debtor within the Federal lines. But there is no proof in this case of any purpose on the part of Billgery to present or collect this check across the lines of contending armies. On the contrary, his conduct bespeaks a different purpose. He quietly remains at his home till the advancing wave of conquest passes over him and opens communication for him with New Orleans. He then duly presents his bill, and upon non-payment has it protested, and attempts to give notice thereof in the accustomed mode. Bu,t his right of action was still in abeyance, because his endorsers were separated from him by a line of bayonets. This continued to be the case till the insurrection was finally broken and suppressed by the surrender of Lee. Then his rights and remedies awoke from their state of suspended animation, and were endued with as much power and life as if the municipal law had never suspended them. It seems to me that this is a just and accurate interpretation of the terms and spirit of the law, and fully sustains the present cause of action.
The undertaking or agreement of the appellees, as endorsers, however, was collateral and contingent. To hold them responsible, due and reasonable diligence must be shown in giving them notice of the dishonor; so that they might enjoy every conceivable opportunity and facility of securing themselves from loss. The question of due diligence, is one of law; and is well settled by a numerous train of authorities. The party, whose duty it is to give this notice is bound to due and reasonable diligence; but.it is not required of him to see that the notice is brought home to the party. If it is given in the usual way and in reasonable time, it is sufficient to excuse the party, on whom it rests, *417 though it may never he received. 1 Am. L. Cas., p. 396, and note. But an omission to give this notice may he excused by circumstances rendering it impossible to do so. But the excuse is contemporaneous with the obstacle; so that upon the removal of the latter, the duty revives. The pendency of war is an adequate excuse. 1 Pars. on Cont. 278; Hopkirk v. Page, 2 Brock. 20. Here, then, there was no duty to give notice till the war ended. It is not, therefore, material to enquire into the validity of the notice that was mailed along with the protest in October 1863, when there was no mail communication with Virginia. It was perhaps futile and supererogatory. But was this notice given in the usual way and in due time after this impediment was removed? The proof is that about two weeks after the surrender of Lee’s army, the appellant wrote a letter to Branch & Sons from New Orleans, informing them of the protest of the bills; and it was just at that time, as is proven by a special agent of the post-office department, that mail communication was first opened from within the United States lines to Richmond or Petersburg. This, therefore, brings the appellant within the rule that charges his endorsers and fixes their liability to him on their collateral undertaking' for the honor of the bills which they sold him.
On the whole, therefore, it seems to me that the demurrer to the amended declaration should have been overruled, and judgment given for the plaintiff’s demand.
Jotnes, J. The counsel for the defendants have contended in the argument: 1. That the contracts arising out of the endorsement and delivery of the checks by the defendants to the plaintiff were illegal and void, so that no action could be founded upon them. 2. That if these contracts were legal and valid, there has been *418 no sufficient presentment and demand of payment of the checks. And 8. That if the presentment and demand were sufficient, there has been no sufficient notice of dishonor.
Premising that a check is a bill of exchange, though subject to some peculiar rules, which need not be now adverted to, and that every endorsement of a bill is equivalent to the drawing of a new bill, I proceed to consider the first and principal question.
It is a general principle of law, that war operates as an interdiction of all commercial and other pacific intercourse and communication with the public enemy; and it follows as a corollary from this principle, that every species of private contract made with subjects of the enemy during war is unlawful. “ The rule thus deduced,” says Wheaton, “is applicable to insurance on enemy’s property and trade; to the drawing and negotiating of bills of exchange between subjects of the powers at war; to the remission of funds in money or bills to the enemy’s country; to commercial partnerships entered into between the subjects -of the two countries after the declaration of war, or existing previous to the declaration, which last are dissolved by the mere force and act of the war itself, although as to other contracts [existing before the war] it only suspends the remedy.” Wheat. Elements, by Lawrence 556. So Kent says: “ The insurance of enemy’s property is an illegal contract, because it is a species of trade and intercourse with the enemy. The drawing of a bill of exchange by an alien enemy on a subject of the adverse country, is an illegal and void contract, because it is a communication and contract. The purchase of bills on the enemy’s country, or the remission and deposit of funds there, is a dangerous and illegal act, because it may be cherishing the resources and relieving the wants of the enemy. The remission of funds in money or bills to subjects of the enemy is *419 unlawful. The inhibition, reaches to every communication, direct or circuitous. All endeavors at trade with the enemy, by the intervention of third persons, or by partnerships, have equally failed, and no artifice has succeeded to legalize the trade without the express .permission of the government. Every relaxation of the rule tends to corrupt the allegiance of the subject, .and prevents the war from fulfilling its end. The only exception to this strict and rigorous rule of international jurisprudence is the case of ransom bills, and -they are contracts of necessity, founded on a state of war, and engendered by its violence. 1 Kent 67-8.
The same great jurist uses this language in Griswold v. Waddington, 16 John. R. 438. “ There is no authority in law, whether that law be national, maritime or municipal, for any kind of private, voluntary, unlicensed business communication or intercourse with an enemy. It is all noxious, and in a greater or less degree is all criminal. Every attempt at drawing distinctions has failed; all kind of intercourse, except that which is hostile, or created by the mere exigency of •the war and necessity of the case, is illegal. The law has put the sting of disability into every kind of voluntary communication and contract with an enemy, which is made without the special permission of the government. There is wisdom and policy, patriotism and safety in this principle, and every relaxation of it tends to corrupt the allegiance of the subject, and prolong the calamities of war.”
“ The idea that any remission of money may be lawfully made to an enemy, is repugnant to the very rights of war, which require the subjects of one country to .seize the effects of the subjects of the other. The property so remitted, if in cash or any tangible subject, would become a just cause of the seizure while on its passage. An alien enemy has no right of action during war, and he cannot sue, because it would be drawv *420 ing resources out of the country, how then can it be lawful to make remittances to him ? The law that for- • bids intercourse and trade must equally forbid remittances and payment.”
See Halleck Int. Law, 356 et seq.; note to Clementson v. Blessig & al., 11 Exch. R. 135; S. C. 32 Eng. L. & Eq. R. 544.
In Willison v. Pattison & al., 7 Taunt. R. 439 (2 Eng. C. L. R. 167); S. C. 1 J. B. Moore 133 (which latter report of it I will cite, as it is much fuller and better every way than the other), was an action of assumpsit on three bills of exchange accepted by the defendants and endorsed to the plaintiff. They both were drawn at Dunkirk in France by Michelon, a subject of France, resident there, payable to his own order three months after date upon the defendants, British subjects, resident in London, who were the holders of •certain cambrics, shipped to them by Yarlet of Dunkirk, and by him assigned to Michelon. The' bills were accepted, payable when the cambrics should be sold, which were subsequently done. The bills were endorsed by Michelon, the drawer, to the plaintiff) an English born subject, then and still a resident of Dunkirk. At the time these bills were drawn, endorsed and accepted, France and England were at open war with each other. The action was brought after the return of peace, and the court held that it could not be maintained.
■ Gibbs O. J. thus states the propositions maintained by the respective counsel in the argument. “My brother Best has contended that all communication with an alien enemy, during wax-, must be prohibited, as the policy of law thereby secures this State from all ■dangers to be apprehended from a foreign country, and that in order to prevent all communication with a foreign enemy, he has insisted, that if subjects of a foreign State draw bills on persons in this country, and seek to enforce payment thereon, the mischeif is *421 incurred. He has further insisted that this was a direct trading. This, however, my brother Lews has denied, and contended that the mere drawing or en- - dorsing bills is not such a communication, with an enemy as is contravened by the general policy of law.” And' the Chief Justice, in giving the reasons of his judgment, said: “ It is illegal for an alien, in an enemy’s country, during war, to, draw a bill on a subject resident in this, and then sue him here for the amount of such bill, on the restoration of peace. It gives rise to a communication between subjects of both countries, which ought to be avoided. The drawing and accepting these bills are in themselves illegal.” Park J. after quoting the rule ex natura belli commerda inter hosies cessare non est dubitandum, adds: “Although the evidence of trading is not conclusive, it is still a trading.”'' * * * “ Though the plaintiff might be in ignorance of the circumstances attending these bills, still he receives them from the drawer, and must, therefore, be fully aware that they were a species of contract, originating with an alien enemy.” Burrough J. said: “It was the object of the drawer in the present case, who was an alien, to obtain money from the acceptors, who were residents in this country. The drawer having assigned [consigned ?] the cambrics to the acceptor for sale, is entitled to the money arising on the bills. Can it be contended, that if the cambrics had been sold, Michelon could have maintained an action for money had and received? If not he could by no device obtain it from this country. If, therefore, the action for money had and received could not be maintained by Michelon, being an alien enemy, can he possibly transfer his interest to another, which interest will ultimately revert to his benefit.
In Willison v. Pattison there was an actual communication had and a contract directly made, between subjects of the hostile powers, inasmueh as the bill was sent *422 over from France to England for acceptance, and was-accepted. But it is not necessary that any such actual - communication should take place,' in order to vitiate the contract of the drawer or endorser of'a bill. - "When a man draws a bill upon another and negotiates it, he, in substance and fact, dispatches a communication to him, directing him to pay the money to the owner of the bill. The drawing and negotiation of the bill have a direct tendency to bring about actual intercourse and communication, because, the bill cannot otherwise perform its office. And, upon general principles, any contract is unlawful, which has a tendency to promote and encourage the doing of an act which the law condemns and forbids, whether, in any particular case, the act be really done or not. Upon this ground the vice attaches to the drawing and negotiation of the bill. The other ground of decision stated by Burrough J., namely, that the bill is an attempt by the drawer to transfer to another a right to demand and receive money which he could not lawfully demand himself, leads to the same result. Obviously, if' the drawer may lawfully draw for his funds in the-hands of the drawee, the drawee may lawfully pay the drafts', or remit the funds. But, as we have seen, the payment or remittance of money by a subject or citizen of one belligerent to a subject or citizen of the other, during war, is unlawful. Griswold v. Waddington, supra.
But it was contended, with great earnestness and ability, by the counsel for the plaintiffj that the rights of the parties in this case must be determined with-reference to the municipal law alone; that the late conflict between the United States and the Confederate States was not a war in the legal sense, and did not produce the effects of a war upon the lights and relations of citizens; that on the part of the Confederate States it was nothing more than an insurrection or rebel *423 lion against the lawful authority of the United. States, and on the part of the United States was only an exertion of force to suppress the insurrection; and that the principles of international law, applicable to a war inter gentes, cannot properly be resorted to for the determination of any question between citizens arising out of that conflict or affected by it. It was further argued, that the only restriction upon intercourse during the war was that imposed by the act of congress of July 13, 1861, and the proclamation of August 16, 1861, which was merely a suspension for a time of the right of free intercourse guaranteed by the constitution; and that the existence of the conflict between the government and the insurgents, and the suspension of intercourse during its existence, did not deprive any citizen of the right to draw a bill of exchange upon another citizen, or any other citizen of the right to purchase such a bill, even though the drawer and drawee were on opposite sides of the conflict, such acts not involving any actual locomotive intercourse, which would alone violate the prohibition against intercourse; and that, in order to defeat a recovery in this case, it was incumbent on the defendants to establish that there has been a violation of that prohibition.
I shall not enter upon a discussion of the theory and principles of the constitution of the United States, or of the respective rights and powers of the Federal and State governments, for the purpose of determining the political and constitutional character and consequences of the late unhappy conflict. Fortunately, such a discussion is not necessary. The principles of law which are to be applied to the solution of the question now before us, seems to me to have been fully settled by the Supreme court of the United States. I do not think it necessary to cite the decisions of any inferior tribunal, and shall cite only a few cases in the Supreme court.
*424 The subject of the late war first came before the Supreme court in The Prize Cases, 2 Black U. S. R. 635, decided at December term 1862. These cases involved the validity of certain captures for breach of the blockade established by president Lincoln in April 1861, at a time when no legislation had been had by congress in reference to the war. Dour vessels were involved, two of which belonged to neutrals, and two to citizens of Biehmond, Yirginia. Two questions were discussed and decided by the court: 1. Had the president a right to institute a blockade of ports in the possession of pei’sons in armed rebellion against the government, on the principles of international law? 2. Was the property of pex’sons domiciled or residing withixx the States in rebellion, a proper subject of capture on the sea as “enemies’ property?”
The court, after observing that the right of prize and capture depended on the jus belli, proceeded to en-quire whether, at the time the blockade was instituted, a state of war existed between the United States and the insurgents. If these relations, existing under the constitution, between the government and the insurgents, had the effect of rendering it impossible that a conflict between them could be a war, in the legal sense, and of restricting the government to the use of means provided by the municipal law for the suppression of an insurrection, then the blockade was not lawfully instituted. In order, therefore, to determine the validity of the blockade, it was necessary to determine what was the legal character of the relations existing between the parties to the conflict.
The following extracts from the opinion will exhibit the views of the court:
“ The parties belligerent in a public war are independent nations. But it is not necessary, to constitute war, that both parties should be acknowledged as independent nations or sovereign States. A war may exist *425 when one of the belligerents claims sovereign rights as against the other.”
“A civil war,” says Yattel, “breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. These two parties therefore must necessarily be considered as constituting, at least for a time, two separate bodies, two distinct societies. Having no common superior to judge between them, they stand in precisely the same predicament as two nations who engage in a contest and have recourse to arms.”
“ The true test of the existence of civil war, as found in the writings of the sages of the common law, may be thus summarily stated. When the regular course of justice is interrupted by revolt, rebellion or insurrection, so that the courts of justice cannot be kept open, civil war exists, and hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies invading the land.”
“ It is not the less a civil war with belligerent parties in hostile array, because it may be called an insurrection by one side, and the insurgents be considered as rebels or traitors. It is not necessary that the independence of the revolted province or State be acknowledged in order to constitute it a party belligerent in a war according to the law of nations.”
“ The law of nations is also called the law of nature, it is founded on the common consent as well as the common sense of the world. It contains no such anomalous doctrine as that which this court are now for the first time desired to pronounce, to wit, that insurgents who have risen in rebellion against their sovereign, expelled her courts, established a revolutionary government, organized armies, and commenced hostilities, are not enemies, because they are traitors, and [that] *426 a war levied on the government by traitors, in order to dismember and destroy it, is not a war, because it is an insurrection.”
Pursuing these views, and others which need not be adverted to, the court held that there existed between the government of the United States and the insurgents a state of civil war, in the sense of the international law, which brought with it the common incidents of war, and among them the right to institute a blockade.
The views of the court upon the second question will appear from the following extracts:
“ The appellants contend that the term ‘ enemy’ is' properly applicable to those only who are subjects or citizens of a foreign State, at war with our own.” * * * “ They contend also that insurrection is the act of individuals, and not of a government or sovereignty; that the individuals engaged are subjects of law; that confiscation of their property can be effected only under a municipal law; that by the law of the land, such confiscation cannot take place without the conviction of the owner of some offence; and finally, that the secession ordinances are nullities, and ineffectual to release any citizen from his allegiance to the national government, and consequently that the constitution and laws of the United States are still operative over persons in all the States for punishment as well as protection.”
The court proceeded to show, that thé claim of sovereignty on the part of the United States, did not prevent the exercise of belligerent rights or the existence of belligerent relations, and added:
“ All persons who reside within [the insurgent] territory, whose property may be used to increase the revenues of the hostile power, are in this contest liable to be treated as enemies, though not foreigners. They have cast off their allegiance and made war on *427 their government, and are none the less enemies because they are traitors.”
The four dissenting judges held, that war, in the • legal sense, did not exist at the time the blockade was instituted, because it had not been declared by congress. They held that prior to the act of congress of July 13, 1861, the president could only exercise the powers given to him by the municipal law, his operations being limited to the suppression of an insurrection, but that congress could bring into operation the war power, and thus change the nature and character of the contest; and that, after such action by congress, instead of being carried on under the municipal law, it would be carried on under the law of nations and the acts of congress as war measures, with all the rights of war; p. 692. They not only'held that such a contest, after the action of congress, would give to the government the rights of war under the international law, but that it would likewise be attended with the consequences of war in respect to the lights and relations of citizens; pp. 688, 693. On p. 687, thebonsequence of a state of war, according to the international law, are stated. They are referred to as consequences which must result from regarding the pending conflict as a civil war. The Judge says: “The people of the two countries become immediately the enemies of each other; all intercourse, commercial or otherwise, unlawful; all contracts existing at the commencement of the war suspended, and all made during its existence utterly void. The insurance of enemies’ property, the drawing of bills of exchange, or the purchase [of bills] on the enemy’s country; the remission of bills or money to it, are illegal and void. Existing partnerships between citizens or subjects of the two countries are dissolved, and, in fine, interdiction of trade and intercourse direct or indirect is absolute and complete, by the mere force and effect of war itself.”
*428 The only point upon which the minority differed from the majority was, in respect to the tiflie at whick ■ the conflict assumed the character of a war, in the legal sense. The majority held, that the conflict had become a war by the mere course of events, and without any action by congress, while the minority held, that the action of congress was indispensable to give it that character. But there was no difference of opinion in respect to the legal consequences resulting from the state of war, whenever the conflict assumed that character.
In The Venice, 2 Wall. U. S. R. 258, the court says : “ While these transactions were in progress, the war was flagrant. The States of Louisiana and Mississippi were wholly under rebel dominion, and all the people of each State' were enemies of the United States. The rule which declares that war makes all the citizens or subjects of one belligerent enemies of the government, and of all the citizens or subjects of the other, applies equally to civil and to international wars.”
This relation of mutual enmity is one of the fundamental conditions of a state of war. It is part of a system of rules for the government of men in a state of war, which is founded in necessity, and which has been established by common consent throughout the world. That system, as we have seeu, subjects individuals to restraints] and disabilities in respect to their acts aiid contracts, which are unknown in time of peace. The relation of the citizens of the several States under the constitution, is that of friends; the relation between citizens on opposite sides in the late war, was that of enemies. The relations under the constitution were suspended, and superseded for the time, by new relations under the laws of war. And so the rights and privileges existing, under the constitution, in respect to intercourse and contracts, were displaced *429 and superseded, for the time, by the restraints and disabilities which resulted from the state of war.
In The Hampton, 5 Wall. U. S. R. 372, the vessel was captured in a creek in the State of Virginia, and was libelled and condemned as prize of war, upon the principles of the international law. Brinkley, a loyal citizen, appeared and claimed the vessel as mortgagee. The bona Jides of the mortgage were not disputed, nor was it disputed that he was a loyal citizen. The precise offence for which the vessel was libelled is not stated in the report, but it was conceded that the vessel might have been condemned under the act of July 13, 1881. The offence, therefore, was one embraced by that act, which provides that goods, &c., coming from or going to a State in insurrection, by land or water, along with the vessel, &c., in which they are. shall be forfeited.
It was held that the vessel was properly condemned under the international law, which was not superseded by the act of congress, and that notwithstanding the loyalty of the mortgagee, and the fairness of his debt, his right was forfeited upon the principles of international law, though it would have been saved if the condemnation had taken place under the act of congress.
This case, therefore, decides, 1, That intercourse during the late war, was unlawful upon the principles of international law, and independently of the act of congress: And 2, That the effect of the international law was to override and extinguish the claim of a loyal citizen, under a bona fide mortgage.
In The William Ragaley, 5 Wall. U. S. R. 377, Brag-den, who claimed a share of the vessel and cargo, was a loyal citizen, resident in Indiana. At the breaking out of the -war he was a member of a mercantile partnership in Mobile, which owned the vessel and cargo. He never aided the rebellion; never, after the rebellion began, exercised any control or ownership over the *430 vessel or cargo; and had no connection with or knowledge of the unlawful voyage which occasioned the capture. In consequence of his loyalty to the United States, his interest in the partnership effects, had been confiscated by the Confederate government. His claim, was rejected. The court held, among other things, that the effect of the war was to dissolve the partnership existing between the claimant and the parties in Mobile, and that it was his duty promptly to dispose of and withdraw his interest, and that by his failure to do so, his interest became liable to be treated as enemy’s property. These propositions were based exclusively on the principles applicable to international laws. The court further recognized the principle, applicable to war inter gentes, that an executory contract with a citizen or subject of the enemy, if it cannot be performed except in the way of commercial intercourse with the enemy, is ipso facto dissolved, as equally applicable to the late civil war.
In Hanger v. Abbott, 6 Wall. U. S. R. 532, the principle of law applicable to a state of war inter gentes were applied to the late civil war, to determine whether the statute of limitations of Arkansas ran, during the war, against a cause of action held at the commencement of the war, by citizens of New Hampshire against a citizen of Arkansas. In the opinion of the court, the ordinary consequences of a war inter gentes; the prohibition of intercourse; the dissolution of partnerships; the prohibition of contracts made during the war, and the suspension or dissolution of contracts made before the war; the right to confiscate debts due to citizens or subjects of the enemy; the suspension of the remedy for the recovery of debts, and the restoration of the remedy upon the return of peace; were fully stated, and were recognized as equally applicable to the late civil war. It was accordingly held, that the act of limitations did not run during the war. And this decision *431 was placed exclusively upon the principles of international law applicable to a state of war inter gentes.
These decisions of the Supreme court settle beyond question that the late conflict between the United States and the Confederate States was a war, in the legal sense, with all the incidents and consequences of a war, as they are known to the international law; that accordingly all the citizens on one side were enemies of all the citizens on the other, and that all commercial or other pacific intercourse or communication between them, unless specially authorized, was unlawful, to the same extent and for the same reasons as in a war inter gentes, and that in order to determine how the contracts of individual citizens were affected by the late war, recourse must be had to the general principles applicable to a state of war, as they are found in the international code.
This doctrine by no means involves a recognition of the Confederate States as a political sovereignty. The •concession by the government of belligerent rights to the Confederate States, and the application by the courts of the general laws of war, to the determination of questions arising out of the conflict, only recognize the existence of a conflict of such magnitude, and with such an array of strength, that it could not be dealt with otherwise than as a war; they involve no concession of political rights to the association of States which carried on the conflict.
Uor does the fact that Louisiana was one of the Confederate States, and that the city of blew Orleans was to the last claimed by the Confederate States as belonging to them, afford any ground for refusing to apply the law of war to this case. The checks were drawn and endorsed after the city of blew Orleans had passed under the permanent dominion and control of the United States. Its relation to the Confederate States, which were only a government de facto, and *432 whose authority was therefore dependent upon the exercise of power, and not upon the existence of right, were thus broken up and destroyed. From that time we must regard New Orleans as belongingto the Federal side of the conflict, and its citizens as enemies of the citizens of the other belligerent. 6 Wallace 521, and cases cited. Hor does it make any difference that the plaintiff and defendants were all of them citizens of the Confederate States, if, as claimed by the defendants, the contract between them was in violation of the common law of the civilized world.
I do not think it necessary to consider whether, as contended by the counsel for the plaintiff, the act of congress of July 13, 1861, and the proclamations of the president in pursuance of it, prohibiting commercial intercourse, were a law to the parties to this suit at the date of their contract, all of whom were then citizens and residents of the Confederate States. If they were, it would not follow, as contended by the counsel, that actual locomotive intercourse was neoessary in order to affect the contract between these parties. Such actual locomotive intercourse, accomplished or attempted, would, doubtless, be necessary, as under the general law of war, to subject property to forfeiture. But the prohibition of intercourse, thus made by congress, must be construed with reference to the object it was designed to effect, and so enforced as to accomplish the policy on which it was founded. It was obviously dictated by the same policy, and designed to effect the same ends, as the like prohibition in the international law, and any contract which would be regarded as a' violation of the one, ought to be regarded as a violation of the other.
But even if this act of congress did not opératelas a law to the parties to this suit, at the date of their contract, I apprehend that no court of the United States, or of a State, should lend its aid for the enforcement *433 of a contract made in violation of the policy of that act. This coni’t must deal with this case just as a court of the United States would deal with it.*
The argument that Bilgerry had a right, which was guarantied to him by the constitution, to go to New Orleans at his pleasure, which was only suspended by the war, seems to me to have no force. The suspension was accompanied by an absolute interdict of all commercial intercourse in the meantime, and a consequent disability to enforce any contract made dui’ing the war, which tended to produce a violation of that interdict. The interdict was as absolute while it lasted, and as fatal to all contracts in violation of its policy, as if it had been perpetual, or as if there had been no such general right of intercourse' under the constitution.
It was argued too, that Bilgerry might have intended to keep these checks, until it should become lawful to present them for payment, and that the court ought rather to presume a lawful than an unlawful in *434 tent. I doubt whether a party who makes a contract during war, which, upon its face, and according to the usual intent and import of such contracts, is a violation of the policy of non-intercourse, ought to be allowed to say that he did not design any such violation. It would be difficult to determine whether such an averment was founded in truth, and to permit such defences to be alleged, would cripple the efficiency of the rule, which, we are told, admits no exceptions (6 Wallace R. 535), and which declares “ a strict and rigorous” policy, which no artifice is permitted to evade.
But what are the facts ? Bilgerry parted with his money to Branch & Sons, in February 1863. He would necessarily lose interest until he could collect the money on the checks. He has been examined as a witness, as have also the only two of the defendants who were cognizant of the transaction. Neither of them testifies that there was any understanding or expectation tliat the presentment of the checks would be withheld, much less any contract that they should be withheld, until it should be lawful to present them. On the contrary, John B. Branch, who conducted the transaction with Bilgerry, shows his understanding ’and expectation, when he says, that he “judged Bilgerry to be a blockade runner.” And not only does Bilgerry nowhere say that there was any understanding with Branch, or any intention on his own part, that presentment would be delayed, but he admits, that after he bought the checks, he tried to find somebody by whom he could send them to New Orleans for collection, but could not. The checks indeed seem to have remained in Virginia from August, 1862, when they were drawn, to February 1863, when they were sold to Bilgerry. But that fact throws no light on the contract between Bilgerry and Branch & Sons. It may be accounted for by supposing, that nobody had been found, in that interval, who wanted funds on *435 New Orleans, or who would pay enough for them. "When we remember how much activity and enterprise were displayed during the war, in “ running the blockade,” and the large profits that were made by it, we should require pretty strong proof to convince us, that a party who drew a sight draft on a point where Federal money was to be had, contemplated that it would be withheld from presentment for an indefinite period of the war, or that a party who laid out a large •sum in the purchases of such a draft, intended so to withhold it.
It follows, from these views, that, upon the evidence, the judgment was properly rendered for the defendants. They also show that the demurrers to the special counts were properly sustained. Each- of those counts sets out the drawing of a check by a bank in Richmond upon a bank in New Orleans, and the endorsement of the check by the defendants to the plaintiff, at periods when we know that the war was flagrant, and all commercial and other intercourse between Richmond and New Orleans were unlawful.
But even if the contract could be held valid, there is another ground which is fatal to the case of the plaintiff, both upon the pleadings and the evidence. In order to charge the defendants as endorsers, it was necessary that.the checks should be presented to the Canal bank and payment thereof demanded, and, in case ‘of dishonor, that due notice thereof should be given to the defendants. The only presentment and demand set out in the pleadings or proved by the evidence, were made on the 27th day of October 1863, when all commercial intercourse between Yicksburg, where the plaintiff resided, and New Orleans, where the checks were payable, was unlawful. By the proclamation of the president, dated August 16, 1861, prohibiting .intercourse with the States in rebellion, an exception was made of “such parts of States as maybe from *436 time to time occupied and controlled by forces of the-United States engaged in the dispersion of the insurgents.” This exception is set out in the amended declaration, and was relied on in the argument as authorizing Billgerry to go to blew Orleans after the fall of' Vicksburg. But this exception was repealed by the proclamation of April 2,' 1863. That proclamation declared the same States to be in insurrection, and revoked all the exceptions made in the former proclamation, but again made certain local exceptions, of which “the port of blew Orleans” was one. This proclamation declares “that all commercial intercourse not licensed and conducted as is provided in said act, between the said States and the inhabitants thereof, with the exceptions aforesaid, is unlawful, and will remain unlawful until such insurrection shall cease, or has been suppressed, and notice thereof has been given by proclamation.” Vicksburg was not excepted from the operation of this proclamation, so that commercial intercourse, except with the license of the president, between Vicksburg and blew Orleans was unlawful at the time at which presentment of these checks was made. The license given to Billgerry by the military authorities was a nullity. The Ouachita Cotton, 6 Wall. U. S. R. 521.
The demand of payment therefore which was made, was one which the plaintiff could not lawfully make,- and which the Canal Bank could not lawfully comply with. A demand to charge the endorsers should have been one which the bank might lawfully have complied with.
In respect to the question of notice of dishonor very little need be said. To give any effect to the notice deposited in the postoffice in blew Orleans in October-1863, it should at least have been shown that the law, or a general usage, required that the letter containing-the notice should be preserved by the postmaster until *437 the restoration of intercourse, and then forwarded to its destination. In the absence of such proof, the deposit of a notice in the postof6.ee at New Orleans, addressed to Petersburg in the midst of the war, was of no avail. It is not necessary to express an opinion as to whether the evidence is sufficient to prove that due notice was given to the defendants after the close of the war.
Upon the whole, I am of opinion that the judgment ■ought to he affirmed.
Moncure, P. concurred in the opinion of Joynes, J.
Judgment aeeirmed.

 Substantially the same question involved in this case was decided by Chief Justice Chase in the Circuit court at Richmond, June 1868, in the case of Moon & Bro. v. Foster & Moon, of which I have obtained an authentic account since this opinion was delivered.
The action was brought to recover the amount of certain negotiable notes. The defendants pleaded payment, and accord and satisfaction, and to sustain their defence, gave in evidence a draft drawn by the Bank of North Carolina at its branch in Winslow, in that State, on the branch of the Bank of Virginia at Portsmouth, bearing date the 10th day of December 1862, which draft, it was contended, was delivered by the defendants to the plaintiffs, and accepted by them in payment of the debt. At the date of the draft, Portsmouth was in the permanent occupation and control of the forces of the United States; but the condition of Winslow, in that respect, was a subject of dispute.
The Chief Justice instructed the jury, “that if they should find that Winslow was not, at the time of the making and issuing of the draft, in the occupation or control of the national forces, then the draft in controversy being an act of prohibited commercial intercourse, was not valid negotiable paper.’’ Whether Winslow was so occupied or controlled he left to the jury.